Kenneth R. MANCUSO

v.

James L. TAFT, Mayor, City of Cranston,
Earl Croft, Director of Personnel,
City of Cranston.

Civ. A. No. 4751.

United States District Court,
D. Rhode Island.

April 17, 1972.

Ralph J. Gonnella, Providence, R. I., for plaintiff.

Peter Palumbo, Jr., Cranston City Solicitor, Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

The right of the City of Cranston to restrict the extra curricular political activities of its classified civil service employees is at issue here. Plaintiff, a full time police officer, became a candidate for nomination for representative to the Rhode Island General Assembly on October 19, 1971, in violation of sections of the Cranston City Charter. Faced with suspension from employment, he seeks declaratory and injunctive relief from this Court, arguing that such sections of the Charter are unconstitutional, being in violation of the First, Ninth, Tenth, and Fourteenth Amendments to the Constitution of the United States.

Relief is sought pursuant to 42 U.S. C.A. §§ 1981, 1983, and 1988. Jurisdic-

tion is founded in 28 U.S.C. § 1343 and 28 U.S.C. §§ 2201, 2202. Plaintiff seeks preliminary and permanent injunctive relief enjoining defendants from suspending or removing him from the classified service and a declaration that the challenged provisions of the City Charter and the Civil Service Rules and Regulations are unconstitutional on their face and as applied to him. Both plaintiff and defendants have moved for summary judgment, there being no genuine issues of fact in dispute. See Besaw v. Affleck, 333 F.Supp. 775 (D.R.I.1971).

Plaintiff, Kenneth R. Mancuso, is a full time police officer and classified civil service employee of the City and Cranston. The City of Cranston Home Rule Charter § 14.09 provides that:

> "The following practices are prohibited: . . .
>
> c. Continuing in the classified service of the City after becoming a candidate for nomination or election to any public office . . .
>
> .    .    .    .    .    .
>
> Any officer or employee of the City wilfully violating any of the provisions of this section, shall be removed from such office or employment."

Knowing of this Charter provision, plaintiff filed nomination papers to become a candidate for representative from the 28th District to the Rhode Island General Assembly. On October 19, 1971, the Mayor of Cranston took action pursuant to Section 14.09(c) and attempted to remove plaintiff from employment. That same day plaintiff filed his complaint in this Court. A temporary restraining order was entered, restraining the Mayor's action. Plaintiff's nomination attempt was unsuccessful, and he now faces suspension from the police force for having violated the Charter provision.[1]

While the City expressly relied on Charter Section 14.09(c) in its attempts to remove or suspend plaintiff, plaintiff challenges the constitutionality of Charter Sections 14.09(c) and (f) and Civil Service Rule 10, subsections 3C and 3F. Charter Section 14.09(f) provides as follows:

> "The following practices are prohibited: . . .
>
> .    .    .    .    .    .
>
> (f) Making directly or indirectly if a member of the classified service any contribution to the campaign funds of any political organization or candidate for public office or taking any part in the management of any political organization or in the conduct of any political campaign further than in the exercise of the rights of a citizen to express his opinion and to cast his vote."

Civil Service Rule 10, subsections 3C and 3F are simply restatements of Charter Sections 14.09(c) and (f). None of these provisions are limited to partisan political activity.

Thus, the question arises as to whether plaintiff has standing to challenge section 14.09(f), since there has been, it is argued, no actual or threatened enforcement of that section against him. See Wisconsin State Emp. Ass'n v. Wisconsin Natural Resources Bd., 298 F. Supp. 339, 349 (W.D.Wis.1969). Plaintiff has violated section (f)'s prohibition on taking any part in the conduct of any political campaign and is equally subject to dismissal for violation of section (f) as for violation of section (c). That the City chose one of two alternate grounds for the disciplining of plaintiff does not negate plaintiff's actual controversy with section (f). The facts that plaintiff has actually violated section (f), that he is subject to penalty for this violation, and that he challenges the facial constitutionality of the section establish his standing to attack section (f). See Wulp v. Corcoran, 454 F.2d 826 (1st Cir. 1972).

Defendants argue that United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947) (*Mitchell*) controls this case both on the facts and on the law and mandates a holding that the Cranston charter sections are constitu-

---

1. Because plaintiff still stands to suffer direct injury even though the election period is over, there is no problem of mootness.

tional. In *Mitchell* the Supreme Court upheld the constitutionality of provisions of the Hatch Act, 5 U.S.C.A. § 7324(a)(2), which prohibits officers and employees of the executive branch of the federal government, with certain exceptions, from taking

"any active part in political management or in political campaigns."

This prohibition on political activity in the Hatch Act does not extend to nonpartisan political activity.[2] The opinion by Justice Reed employed a standard of review which gives great deference to the legislative judgment and which is most often employed in economic regulation cases—a rational relationship test:

"For regulation of employees it is not necessary that the act regulated be anything more than an act reasonably deemed by Congress to interfere with the efficiency of the public service."

330 U.S. at 101, 67 S.Ct. at 570.

A pervasive fear that partisan political activity by public employees would corrupt the neutrality of the civil service system and destroy its efficiency resounds throughout *Mitchell*. The *Mitchell* Court relied heavily on a history of support for such regulation, 330 U.S. at 96–100, 67 S.Ct. 556, 91 L.Ed. 754, including reliance on the then accepted doctrine that public employment was a privilege and not a right, 330 U.S. at 99 n. 34, 67 S.Ct. 556, 91 L.Ed. 754.

Defendants argue that *Mitchell* has not been overruled and that federal courts continue to follow it, see Northern Virginia Regional Park Authority v. United States Civil Service Commission, 437 F.2d 1346 (4th Cir. 1971) cert. denied 403 U.S. 936, 91 S.Ct. 2254, 29 L.Ed.2d 717; Wisconsin State Employees Association v. Wisconsin Natural Resources Board, 298 F.Supp. 339 (W.D.Wis.1969), as should this Court.

Plaintiff contends that *Mitchell* is no longer good law and the challenged sections do not withstand scrutiny under current standards of review in First Amendment overbreadth doctrine. Further, he claims that the ordinance is unconstitutionally vague and violates the Due Process and Equal Protection clauses of the Fourteenth Amendment and the Ninth and Tenth Amendments.

Whatever the current status of *Mitchell* as law, it appears that the facts of *Mitchell's* world are not the facts of life today. The passage of time has provided an answer, in part, to the comment of the *Mitchell* court:

"We do not know whether the number of federal employees will expand or contract; whether the need for regulation of their political activities will increase or diminish."

330 U.S. at 102, 67 S.Ct. at 570–571.

It has been estimated that by 1968 there were, excluding members of the armed forces, some three million federal employees and nine million State and local government employees, representing approximately 15 percent of the total working force. U.S. Bureau of the Census, Statistical Abstract of the United States: 1968 (89th ed) as cited in Emerson, The System of Freedom of Expression, 563.

2. 5 U.S.C.A. § 7326:

"§ 7326. Nonpartisan political activity permitted

Section 7324(a)(2) of this title does not prohibit political activity in connection with—

(1) an election and the preceding campaign if none of the candidates is to be nominated or elected at that election as representing a party any of whose candidates for presidential elector received votes in the last preceding election at which presidential electors were selected; or

(2) a question which is not specifically identified with a National or State political party or political party of a territory or possession of the United States.

For the purpose of this section, questions relating to constitutional amendments, referendums, approval of municipal ordinances, and others of a similar character, are deemed not specifically identified with a National or State political party or political party of a territory or possession of the United States. Pub.L. 89–554, Sept. 6, 1966, 80 Stat. 526."

Restrictions on the freedom of political expression of such a large portion of the population[3] is a matter of much concern. "While the language of the Constitution does not change, the changing circumstances of a progressive society for which it was designed yield new and fuller import to its meaning." Sweezy v. State of New Hampshire, 354 U.S. 234, 266, 77 S.Ct. 1203, 1220, 1 L.Ed.2d 1311 (1957) (J. Frankfurter, concurring).

The deference given by the *Mitchell* court to the legislative judgment about restrictions necessary on an individual's First Amendment freedoms for the good running of government has not been subscribed to in subsequent decisions.[4] In Sweezy v. State of New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957), a case involving investigation of a university teacher's political associations by a legislative committee, the Court stated:

"Equally manifest as a fundamental principle of a democratic society is political freedom of the individual. Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association. This right was enshrined in the First Amendment of the Bill of Rights. Exercise of these basic freedoms in America has traditionally been through the media of political associations."

354 U.S. at 250, 77 S.Ct. at 1212.

Constitutional justification for the restrictions on the teacher's First Amendment freedoms required that the restriction be connected with a fundamental interest of the State. Id. at 251, 77 S.Ct. 1203.

Implicit in the standard of review articulated in *Sweezy* is the requirement that such restrictions be narrowly drawn. As was said in Elfbrandt v. Russell, 384 U.S. 11, at 18, 86 S.Ct. 1238, at 1242, 16 L.Ed.2d 321 (1966):

"A statute touching those protected rights must be 'narrowly drawn to define and punish specific conduct as constituting a clear and present danger to a substantial interest of the State.' Cantwell v. Connecticut, 310 U.S. 296, 311 [60 S.Ct. 900, 906, 84 L.Ed. 1213]. Legitimate legislative goals 'cannot be pursued by means that broadly stifle

---

3. It has been estimated that in 1966 at least eight million employees and members of their families were affected by the restrictions of the Hatch Act and the "little Hatch Acts" of state and local governments. T. Emerson, The System of Freedom of Expression, 584 (1970).

4. There are indications that Congress today might not consider the restrictions of the Hatch Act to be reasonable: "In 1966 Congress created a Commission on Political Activity of Government Personnel, which conducted an extensive inquiry and made its report in the fall of 1967. The Commission recommended drastic changes in the Hatch Act. It proposed that the law be reframed so as to 'specify in readily understandable terms those political activities which are prohibited, and specifically permit all others.' It would allow Federal employees to 'join a political party or other party organization and actively participate in its affairs,' except to serve as an officer, to 'become a candidate for and serve in a local office' that was part time, paid not more than a nominal compensation and involved no conflict of interest; and 'serve as a delegate to a political or constitutional convention.' Half the Commission would also allow Federal employees to hold the office of ward or precinct committeeman. Specifically prohibited would be partisan political fund raising at any level; becoming a candidate for or holding any office other than a 'local' one; managing a campaign for a candidate seeking a non-local office; acting as recorder or watcher at the polls; serving as an officer in a political organization. The Commission also proposed clarifying and improving enforcement of statutes directly protecting Federal employees from corrupt political pressures, such as coercion, solicitation of funds, and the like. It suggested further study of a proposal for creating an ombudsman to protect government employees from improper political pressures."

Report of the President's Commission on Political Activity of Government Personnel, supra note 8, vol. 1, pp. 3–6, 39–60, cited in Emerson, *supra*, at 589.

fundamental personal liberties when the end can be more narrowly achieved.' Shelton v. Tucker, 364 U.S. 479, 488 [81 S.Ct. 247, 252, 5 L.Ed.2d 231]. And see Louisiana [ex rel. Gremillion] v. N.A.A.C.P., 366 U.S. 293, 296–297 [81 S.Ct. 1333, 1335, 6 L.Ed.2d 301]."

The use of the rational basis standard of review in *Mitchell* precluded scrutiny of the regulation for overbreadth. To quote from Hobbs v. Thompson, 5 Cir., 448 F.2d 456, 472:

"This standard of review, with its almost wholesale deference to the legislature's judgment, would make strict overbreadth scrutiny of the Macon scheme impossible. *Mitchell,* in other words, held that a broad prophylactic rule against political activity—which, in the individual case, might proscribe conduct unrelated to a significant state interest—could be upheld so long as the legislature's overall judgment was premised upon a rational basis."

█ It is vigorously argued that by subsequent caselaw the Supreme Court has implicitly overruled *Mitchell* and that the legislative judgment should be subject to strict scrutiny. See Hobbs v. Thompson, *supra*; Note, Civil Disabilities and the First Amendment, 78 Yale L.J. 843, 861 (1969); The Supreme Court, 1966 Term, 81 Harv.L.Rev. 69, 170 (1967). But cf. Northern Virginia Regional Park Authority v. United States Civil Service Commission, 437 F.2d 1346 (4th Cir. 1971). Support for such a conclusion is drawn from United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L. Ed.2d 508 which struck down a portion of the Subversive Activities Control Act of 1950 as an unconstitutional abridgement of the First Amendment freedom of association. The Act made it unlawful for a member of a Communist action organization " . . . to engage in any employment in any defense facility." 389 U.S. at 260, 88 S.Ct. at 421. *Robel's* language is instructive:

"When Congress' exercise of one of its enumerated powers clashes with those individual liberties protected by the Bill of Rights, it is our 'delicate and difficult task' to determine whether the resulting restriction on freedom can be tolerated. See Schneider v. State [of New Jersey], 308 U.S. 147, 161 [60 S.Ct. 146, 150, 84 L.Ed. 155] (1939). The Government emphasizes that the purpose of § 5(a) (1) (D) is to reduce the threat of sabotage and espionage in the Nation's defense plants. The Government's interest in such a prophylactic measure is not insubstantial. But it cannot be doubted that the means chosen to implement that governmental purpose in this instance cut deeply into the right of association. Section 5(a) (1) (D) put appellee to the choice of surrendering his organizational affiliation, regardless of whether his membership threatened the security of a defense facility, or giving up his job. . . .

It has become axiomatic that '[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms.' NAACP v. Button, 371 U.S. 415, 438 [83 S.Ct. 328, 340, 9 L.Ed.2d 405] (1963); see Aptheker v. Secretary of State, 378 U.S. 500, 512–513 [84 S.Ct. 1659, 1667, 12 L.Ed.2d 992]; Shelton v. Tucker, 364 U.S. 479, 488 [81 S.Ct. 247, 252, 5 L.Ed.2d 231] (1960). Such precision is notably lacking in § 5(a) (1) (D). That statute cast its net across a broad range of associational activities, indiscriminately trapping membership which can be constitutionally punished and membership which cannot be so proscribed. It is made irrelevant to the statute's operation that an individual may be a passive or inactive member of a designated organization, that he may be unaware of the organization's unlawful aims, or that he may disagree with those unlawful aims. It is also made irrelevant that an individual who is subject to the penalties of § 5(a) (1) (D) may occupy a nonsensitive position in a defense facility. Thus, § 5(a) (1) (D) contains the fatal defect of over-

breadth because it seeks to bar employment both for association which may be proscribed and for association which may not be proscribed consistently with First Amendment rights. See Elfbrandt v. Russell, 384 U.S. 11 [86 S.Ct. 1238, 16 L.Ed.2d 321]; Aptheker v. Secretary of State, *supra*; NAACP v. Alabama ex rel. Flowers, 377 U.S. 288 [84 S.Ct. 1302, 12 L.Ed.2d 325] (1964); NAACP v. Button, *supra*. This the Constitution will not tolerate."

389 U.S. 264–266, 88 S.Ct. 424–425 (footnotes omitted).

Thus, even when substantial government interests are involved, a regulation restricting First Amendment freedoms is invalid where it prohibits activities which may not be proscribed as well as activities which may be proscribed. Activities may not be proscribed when prohibition of such activity is not relevant to the regulation's purpose and to the effectuating of a substantial state interest.

▮ Further, a regulation is invalid when there are "less drastic means" by which a statute restricting First Amendment rights could achieve its legitimate goal:

"The Government has told us that Congress, in passing § 5(a) (1) (D), made a considered judgment that one possible alternative to that statute—an industrial security screening program—would be inadequate and ineffective to protect against sabotage in defense facilities. It is not our function to examine the validity of that congressional judgment. Neither is it our function to determine whether an industrial security screening program exhausts the possible alternatives to the statute under review. We are concerned solely with determining whether the statute before us has exceeded the bounds imposed by the Constitution when First Amendment rights are at stake. The task of writing legislation which will stay within those bounds has been committed to Congress. Our decision today simply recognizes that, when legitimate legislative concerns are expressed in a statute which imposes a substantial burden on protected First Amendment activities, Congress must achieve its goal by means which have a 'less drastic' impact on the continued vitality of First Amendment freedoms. Shelton v. Tucker, *supra*; cf. United States v. Brown, 381 U.S. 437, 461 [85 S.Ct. 1707, 1721, 14 L.Ed.2d 484] (1965). The Constitution and the basic position of First Amendment rights in our democratic fabric demand nothing less."

*Robel, supra*, 389 U.S. at 267–268, 88 S.Ct. at 425–426.

To the extent that *Mitchell's* deferential standard of review rested on notions that public employment is a "privilege" and not a right, see 330 U.S. 75, at 99, 67 S.Ct. 556, 91 L.Ed. 754, its rationale is also attacked as seriously weakened by a line of cases rejecting such notions.[5] In Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 holding unconstitutional certain state statutes and administrative regulations authorizing dismissal of teachers for failure to make loyalty oaths, the Court emphasized:

"However, the Court of Appeals for the Second Circuit correctly said in an earlier stage of this case, ' . . . the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of

5. The growth of government as a large-scale employer has already been noted. This growth also has implications in a functional analysis of the "government employment is a privilege" theory. "With the increasing size of government as an economic unit . . . it is simply no longer true that a particular infringement related to employment by government is no greater than a particular infringement made by a private employer." Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv.L.Rev. 1439, 1461 (1968). Thus, whatever the factual validity of use of this privilege theory in *Mitchell*, it is less than viable today.

how unreasonable, has been uniformly rejected.' Keyishian v. Board of Regents, [2 Cir.] 345 F.2d 236, 239. Indeed, that theory was expressly rejected in a series of decisions following *Adler* [Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517]. See Wieman v. Updegraff, 344 U.S. 183 [73 S.Ct. 215, 97 L.Ed. 216]; Slochower v. Board of Higher Education, 350 U.S. 551 [76 S.Ct. 637, 100 L.Ed. 692]; Cramp v. Board of Public Instruction, *supra* [368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285]; Baggett v. Bullitt, *supra* [377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377]; Shelton v. *supra* [357 U.S. 513, 78 S.Ct. 1332, Tucker, *supra*; Speiser v. Randall, 2 L.Ed.2d 1460]; see also Schware v. Board of Bar Examiners, 353 U.S. 232 [77 S.Ct. 752, 1 L.Ed.2d 796]; Torcaso v. Watkins, 367 U.S. 488 [81 S.Ct. 1680, 6 L.Ed.2d 982]. In Sherbert v. Verner, 374 U.S. 398, 404 [83 S.Ct. 1790, 1794, 10 L.Ed.2d 965], we said: 'It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege.' "

385 U.S. 605–606, 87 S.Ct. 685.

Recently, in the context of an equal protection clause claim, the Supreme Court reaffirmed:

" . . . this Court has now rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.' "

Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971).

Like the loyalty oath tests, inherent in the restrictions on political activity here is a conclusive presumption that certain associational activities will be unlawful and detrimental to government interests. See Elfbrandt v. Russell,[6] 384 U.S. 11, 17, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966). Conclusive presumptions which impinge on the exercise of fundamental rights have been looked on with disfavor, Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965), even when their elimination will result in administrative inconvenience, Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

Rather than sanctioning such broad prescriptions, the Court has held in one case that a public employee may not be dismissed for exercise of First Amendment rights absent a showing that such exercise impeded proper performance of duties or interfered with the regular operation of his governmental employer. Pickering v. Board of Education, 391 U.S. 563, 572–573, 88 S.Ct. 1731, 20 L. Ed.2d 811 (1968).

That the *Mitchell* deferential standard of review should give way to a stricter standard of review here is also suggested by another line of cases. In Williams v. Rhodes, 393 U.S. 23, 30–31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968), the Court stated:

"In the present situation the state laws place burdens on two different, although overlapping, kinds of rights— the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms. We have repeatedly held that freedom of association is protected by the First Amendment. And of course this freedom protected against federal encroachment by the First Amendment is entitled under the Fourteenth Amendment to the same protection from infringement by the States."

6. *Elfbrandt* held unconstitutional a state law requiring an oath from state employees and providing for prosecution for perjury and discharge from public office of anyone who took the oath and thereafter became or remained a member of a communist party or an organization having for one of its purposes the overthrow of the government. It is noteworthy that Justice White, in dissent, thought this holding was in conflict with *Mitchell*. 384 U.S. at 21, 86 S.Ct. 1238, 16 L.Ed.2d 321.

Involved in the present litigation are the First Amendment rights of government employees to freedom of expression, freedom of association, and freedom to petition the government for redress of grievances. "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." Garrison v. Louisiana, 379 U.S. 64, 74–75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964). Much as the right to vote is a fundamental right, protected because it is the citizen's access to participation in the political processes of his State's legislative bodies, Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and thus the means for preservation of all other rights, the right to run for public office and engage in political activity would similarly seem to warrant protection.

Besides the impairment of the First Amendment rights of public employees, these ordinances act to restrict the rights of the voters of Cranston. Section 14.09 (c) in particular tends to limit the field of candidates from whom voters might choose. Section (c) penalizes the prospective candidate by requiring him to resign from government employment before running for nomination or for office. To the affluent candidate or the candidate with affluent supporters, this penalty effect will not foreclose the candidacy. But to the less affluent candidate who draws his supporters from the less affluent segment of the community, the penalty may well foreclose his candidacy. The correlative effect of the section on voters and on potential candidates suggests a requirement that the ordinance be subject to strict scrutiny. Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972);

Dunn v. Blumstein, 405 U.S. 330, 92 S. Ct. 995, 31 L.Ed.2d 274 (1972). See also Mitchell, supra, 330 U.S. at 111, 67 S.Ct. 556, 91 L.Ed. 754 (J. Black dissenting).

Cognizant that there is a split among the Circuits [7] on the issue of the vitality of Mitchell today, and that the First Circuit Court of Appeals has not had an opportunity to rule on the issue, this Court strongly affirms that a lower federal court must be bound by a Supreme Court holding. The necessity for conformity of constitutional doctrine, for continuity and firmness of precedent, for deference to the wisdom of a superior tribunal is commanding. See Ashe v. Swenson, 399 F.2d 40, 45 (8th Cir. 1968), rev'd 397 U.S. 436, 90 S.Ct. 1189, 25 L. Ed.2d 469 quoted in Northern Virginia Regional Park Authority, supra, 437 F. 2d at 1350. Yet Mitchell does not stand alone in commanding deference. The requirements of Keyishian, Sweezy, Robel, Pickering, and other cases must be respected as well. There comes a point where the vitality of a case, though that case has not been expressly overruled, may be seen to have been vitiated by the force of subsequent decisions. I believe that point has been reached.[8] In the conflict between adherence to the doctrine of stare decisis and my obligation to apply the Constitution as an organic document evolving with the society it governs, I conclude, after much troubling thought and concern, that the Mitchell standard of review, in justice, cannot be applied here.

It is not denied that the government has a strong interest in regulating the political activities of its employees in the interest of maintaining the integrity and the efficiency of its civil service.[9] The

7. Compare Hobbs v. Thompson, 448 F.2d 456 (5th Cir. 1971) with Northern Virginia Regional Park Authority v. United States Civil Service Commission, 437 F.2d 1346 (4th Cir. 1971).

8. See Huerta v. Flood, 103 Ariz. 608, 447 P.2d 866 (1968); Minielly v. State, 242 Or. 490, 411 P.2d 69 (1966); Kinnear v. San Francisco, 61 Cal.2d 341, 38 Cal. Rptr. 631, 392 P.2d 391 (1964); Fort

v. Civil Service Commission of County of Alameda, 61 Cal.2d 331, 337–338, 38 Cal.Rptr. 625, 392 P.2d 385 (1964). Also see Emerson, supra, at 587: "It is a safe assumption that United Public Workers retains little vitality today."

9. There may be a particularly strong governmental interest where the police department is the body involved. See The Policeman: Must He Be a Second-Class

public interest in having an honest civil service and in removing public servants from pressure to engage in corrupt practices is likewise strong. As in *Robel,* the government's interest "is not insubstantial." It might in spite of these considerations be thought that the public interest would better be served by not cauterizing the political activities of precisely those citizens who have knowledge of the deficiencies of particular government departments. Or that it would be better to insure against the building of sinecures by allowing subordinate employees to challenge the faults of their superiors in the political arena.[10] But the wisdom of such considerations is a matter for discussion by the citizenry and in the legislatures, not by the Courts.

Yet, to establish the strong government interest in an efficient and honest civil service is not to establish the constitutionality of these provisions. The question is whether these provisions have been drawn narrowly and specifically enough to meet the overbreadth challenge and precisely enough to meet the vagueness challenge.

Charter § 14.09(f) suffers from both overbreadth and vagueness. In addition to its other faults, the section does not limit itself to partisan political activity and thus is broader than the provisions approved in *Mitchell.* While it may be permissible to restrict political activities such as using official authority for partisan political purposes, political coercion of subordinates, or non-compliance with the merit system in promotion, the shotgun approach taken here is im-

permissible. See T. Emerson, The System of Freedom of Expression, 587–592 (1970). Section 14.09(f) prohibits expression, association, and activities whose suppression is unrelated to any of the legitimate ends discussed. Substantially similar language was found to be an unconstitutional restriction on First Amendment freedoms in Gray v. City of Toledo, 323 F.Supp. 1281, 1288 (N.D. Ohio 1971):

> "[17] Ambiguous words touching upon first amendment rights also suffer the constitutional infirmity of vagueness. The naked use of the words 'political' and 'politics' leaves a police officer in a very precarious position. He must venture a guess as to which activities are encompassed by these words as used in Rule 12. Once he acts, he does so at his peril, always in fear that his superiors in the department will not agree with his particular interpretation of the Rule. Or of equal importance, he could engage in self-censorship by denying himself the opportunity to engage in protected political activity for fear that such activity would later be deemed activity which is not protected by the first amendment. cf. Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959); Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958)."

Almost inevitably this section would act to chill protected First Amendment freedoms by reason both of its overbreadth and its vagueness. See Note, The First Amendment Overbreadth Doctrine, 83

---

Citizen With Regard to His First Amendment Rights?, 46 N.Y.U.L.Rev. 536 (1971), arguing that the police represent a paramilitary organization, strongly dependent on discipline and obedience in order to perform police services, and concluding " . . . reasonable and narrowly drawn limitations upon the political activity of individual policemen applied in nondiscriminatory fashion should contribute to the elimination of the evils of partisanship in police departments without depriving the

individual policeman of any significant aspect of his amendment right of political activity."

10. Or the consideration raised by one commentator that "restrictions on associational activity may eliminate badly needed applicants, qualified in every other way, who have in fact no intention to misbehave." Note, Civil Disabilities and the First Amendment, 78 Yale L.J. 842, 860 (1969). See also *Mitchell, supra,* 330 U.S. at 111, 67 S.Ct. 556, 91 L.Ed. 754 (J. Black, dissenting).

Harv.L.Rev. 849, 871–75 (1970). Nor has the government shown that there are no less drastic means available to accomplish its legitimate ends. See Bagley v. Washington Township Hospital District, 65 Cal.2d 499, 55 Cal.Rptr. 401, 421 P.2d 409 (1966).

Provisions forbidding public employees to be candidates for public office unless they have first resigned their employment has been upheld by some courts, Stack v. Adams, 315 F.Supp. 1295 (N.D. Fla.1970); Wisconsin State Employees Association v. Wisconsin Natural Resources Board, 298 F.Supp. 339 (W.D. Wis.1969), and have been found unconstitutional by other courts, De Stefano v. Wilson, 96 N.J.Super. 592, 233 A.2d 682 (1967); Minielly v. Oregon, 242 Or. 490, 411 P.2d 69 (1966). The question is a difficult one. Such a broad prophylactic rule nets more than the abuses it seeks to encompass, and I find less than sufficient probability of misconduct to justify the restrictions on First Amendment rights. The evils sought to be prevented could be expunged by narrower rules, for instance by conflict-of-interest rules, or by the requirement that resignation from employment must follow election to office, or by leaves-of-absences from employment while campaigning. Because section 14.09(c) is not limited to partisan political candidacy, it goes beyond the limits set by the Hatch Act, and fails even applying *Mitchell* here.

■ Because I hold City of Cranston Home Rule Charter § 14.09(c) and § 14.-09(f) and Civil Service Rule 10, subsections 3C and 3F unconstitutional for violation of the First Amendment, I do not reach the Ninth Amendment, Tenth Amendment, and Fourteenth Amendment Due Process and Equal Protection claims. Defendants' motion for summary judgment is denied. Plaintiff's motion for summary judgment is granted; plaintiff's motion to pursue this action as a class action is denied. The motions for declaratory and injunctive relief are granted. Plaintiff will prepare an order accordingly.