**Robert T. MAGILL et al.**

v.

**Dennis M. LYNCH et al.**

**Civ. A. No. 75–267.**

United States District Court,
D. Rhode Island.

Sept. 15, 1975.

Sheila Cabral Sousa, Cooperating Atty., R. I. Affiliate of American Civ. Liberties Union, Providence, R. I. for plaintiffs.

Moses Kando, Pawtucket City Sol., Pawtucket, R. I., William F. McMahon, Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

The issue presented by this action is whether municipal employees can constitutionally be prohibited from running for non-partisan elective offices in the city by which they are employed. Plaintiffs Robert T. Magill and Martin Healy are firemen employed by the City of Pawtucket, Rhode Island, and, as residents and voters of Pawtucket, they are candidates for the offices of Mayor of Pawtucket and City Councilman, respectively. Under the provisions of the City Charter for the City of Pawtucket, both of these offices are filled by non-partisan elections.[1] Article VIII of the City Charter, however, prohibits city employees from engaging in any political activities, "except his right privately to express his opinion and to cast his vote." Among the prohibited activities are

taking part in a political campaign and becoming a candidate for election to any public office.[2] Violation of these provisions can lead to a fine or imprisonment and immediate dismissal from city employment.[3] Plaintiffs are seeking a declaration that these provisions of the Pawtucket City Charter violate the First and Fourteenth Amendments to the United States Constitution and an injunction prohibiting the defendants, all officials of the City of Pawtucket, from enforcing these provisions. This suit is based on 42 U.S.C. § 1983, and jurisdiction is based on 28 U.S.C. § 1343.[4] The matter is presently before the Court on plaintiffs' motion for preliminary injunction.

In 1972, this Court had occasion to review a "little Hatch Act" similar to the one challenged here in *Mancuso v. Taft*, 341 F.Supp. 574 (D.R.I.1972). In that case, this Court upheld the claim of the plaintiff, a city employee who wanted to run for office in a partisan election, that the challenged provisions of the Cranston, Rhode Island, City Charter were

---

1. Section 6–130 of the City Charter provides:

   "There shall be no party or political designation placed upon any voting machine or paper ballot used in any primary election or election, and all candidates for office in the city, except as herein otherwise specifically provided, shall be deemed to be candidates without party or political designation."

2. Section 8–115 of the City Charter provides in pertinent part:

   "(5) No appointed official, employee or member of any board or commission of the city, shall be a member of any national, state or local committee of a political party or organization, or an officer of a partisan political organization, or take part in a political campaign, except his right privately to express his opinion and to cast his vote.

   "(6) no appointed official or employee of the city and no member of any board or commission shall be a candidate for nomination or election to any public office, whether city, state or federal, except elected members of boards or commissions running for re-election, unless he shall have first resigned his then employment or office."

3. Section 8–201 of the City Charter provides in part:

   "(1) A violation of any of the prohibitions of chapter 1 of this article shall be a misdemeanor, punishable by a fine of not more than three hundred dollars or by imprisonment for not more than ninety days, or both, and if the violator is an officer or employee of the city, by removal from office or immediate dismissal . . . ."

4. At the outset, defendants' argument that plaintiffs should have appealed their case to the State Board of Elections before bringing this suit should be noted. It is well settled in this Circuit, however, that there is no automatic requirement of exhaustion of administrative remedies in § 1983 cases so long as the case is ripe for decision. *Raper v. Lucey*, 488 F.2d 748, 751 (1st Cir. 1973). Here there are no facts in dispute, and the local authorities' construction of the challenged Charter provisions is clear. This case is ripe for adjudication, and requiring plaintiffs to pursue state remedies would serve no purpose. *Cf. Potter v. McQueeney*, 338 F.Supp. 1133 (D.R.I.1972); *Ricciotti v. Warwick School Comm.*, 319 F.Supp. 1006 (D.R.I.1970).

unconstitutionally overbroad. One of the grounds for that conclusion was that the restrictions on political activity placed upon city employees by the City Charter were not confined to partisan activities but were applicable to non-partisan political activity as well. The case was subsequently affirmed by the Court of Appeals for the First Circuit. *Mancuso v. Taft,* 476 F.2d 187 (1st Cir. 1973). Shortly thereafter, however, the continuing vitality of the *Mancuso* case was called into question as a result of the Supreme Court's decision in *U.S. Civil Service Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) (hereinafter *Letter Carriers*), and *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Those decisions, reaffirming the earlier case of *United Public Workers of Am. v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), held that the federal Hatch Act, which limited the political activities of federal civil service employees, and Oklahoma's "little Hatch Act" did not violate the First Amendment.

The defendants contend that the legal issues presented in this case are completely controlled by *Letter Carriers* and *Broadrick* and that the plaintiffs' challenge to the Pawtucket City Charter provisions must therefore fail. This Court, of course, is duty-bound to respect and follow the teachings of the Supreme Court and acknowledges the importance and preeminence of the *Letter Carriers* and *Broadrick* decisions in the area of Hatch Act-type cases, such as the one presently before this Court. Neverthe-less, after careful study and consideration, I must conclude that these two recent Supreme Court decisions do not address the precise circumstances present here and thus do not preclude further inquiry into the constitutionality of the challenged Charter provisions. First, as I will discuss shortly, the factual basis of this case differs from those in *Letter Carriers* and *Broadrick,* so a similar outcome is not mandated in a strict *stare decisis* sense. Second, and more importantly, these differences in the factual bases are sufficiently significant to justify a different result even when examining and applying the same policy considerations the Supreme Court outlined in its two cases.

The key distinction between the case at bar and the *Letter Carriers* and *Broadrick* decisions is that the two latter cases upheld statutes curtailing public employees' political activities only in the context of *partisan* politics. The Hatch Act, challenged in *Letter Carriers,* specifically excludes participation in non-partisan elections from its prohibition of political activity.[5] Similarly, the Oklahoma statute challenged in *Broadrick,* although not explicitly exempting non-partisan political activity, had been construed by appropriate state authorities, and was therefore deemed by the Supreme Court, to be limited to regulating the conduct of state employees solely in the area of partisan politics. 413 U.S. at 617, 93 S.Ct. 2908. In contrast, the provisions of the Pawtucket City Charter challenged here not only appear on their face to prohibit non-partisan as well as partisan political

---

5. 5 U.S.C.A. § 7326:

"§ 7326. Nonpartisan political activity permitted. Section 7324(a)(2) of this title does not prohibit political activity in connection with—

(1) an election and the preceding campaign if none of the candidates is to be nominated or elected at that election as representing a party any of whose candidates for presidential elector received votes in the last preceding election at which presidential electors were selected; or

(2) a question which is not specifically identified with a National or State political party or political party of a territory or possession of the United States.

For the purpose of this section, questions relating to constitutional amendments, referendums, approval of municipal ordinances, and others of a similar character, are deemed not specifically identified with a National or State political party or a political party of a territory or possession of the United States. Pub.L. 89–554, Sept. 6, 1966, 80 Stat. 526."

activity, but are actually being applied against non-partisan political activity in this very case.

The defendants contend that this distinction between limitations on partisan and non-partisan political activity is not a significant one. Counsel for the defendants asserted with great vigor in oral argument that the Supreme Court's language in *Letter Carriers* and *Broadrick* was intended by the Court to go beyond the immediate facts of those two cases and apply to limitations on participation in non-partisan as well as partisan elections. In particular, counsel for the defendants cited the following passage from the *Letter Carriers* case, emphasizing the significance of the absence of the word "partisan" before the words "an elective public office":

"So would [an Act of Congress be valid] if, in plain and understandable language, the statute forbade activities such as organizing a political party or club; actively participating in fund-raising activities for a partisan candidate or political party; becoming a partisan candidate for, *or campaigning for,* an elective public office; actively managing the campaign of a partisan candidate for public office . . . ."

413 U.S. at 556, 93 S.Ct. at 2886, (emphasis added in Defendants' Memorandum in opposition to Motion for Preliminary Injunction at 3).

Defendants' contention is that the above-noted absence of the word "partisan" indicates that the Supreme Court was affirmatively asserting that a statute prohibiting a public employee's campaigning for *any* elective public office, partisan or non-partisan, would be upheld.

An equally plausible reading of this passage, however, could focus on the *presence* of the word "partisan" elsewhere. Thus, while the Court was clearly stating that fund-raising activities for a *partisan* candidate could constitu-

tionally be prohibited, for example, it was remaining silent on the question of fund-raising for a non-partisan candidate, or perhaps even indicating that such activities could not be prohibited. This is the position recently taken by the Court of Appeals for the Third Circuit:

"We think, however, that *Broadrick* and *Letter Carriers,* properly viewed, carve out carefully circumscribed exceptions to the sweeping injunction of the First Amendment, exceptions allowing a legislature . . . to inhibit *only* 'partisan political activity' . . . ."

*Alderman v. Philadelphia Housing Auth.,* 496 F.2d 164 (3d Cir. 1974) (emphasis in the original).

It is clear that the passage cited by the defendants can be properly interpreted only in the context of the case as a whole, and the facts underlying *Letter Carriers* and *Broadrick* indicate that the Court was addressing only the issue of restrictions on partisan political activities and was not reaching the question, one way or the other, as to whether such restrictions can constitutionally be placed on non-partisan political activities.

Had the Court intended to rule on the issue of non-partisan political activity in *Letter Carriers* or *Broadrick,* it probably would have done so explicitly and not through a seemingly fortuitous addition or deletion of a word. This contention is supported by the fact that the partisan/non-partisan distinction in this context is an important one of long standing. As noted earlier, Congress itself made the distinction in the Hatch Act,[6] and the Supreme Court recognized the policy grounds for this distinction as long ago as 1947:

"Modern American politics involves organized political parties. Many classifications of Government employees have been accustomed to work in politics—national, state and local— as a matter of principle or to assure

6. *See note 5 supra.*

their tenure. Congress may reasonably desire to limit party activity of federal employees so as to avoid a tendency toward a one-party system. . . . It is only partisan political activity that is interdicted."

*United Public Workers v. Mitchell, supra,* 330 U.S. at 100, 67 S.Ct. at 569, 91 L.Ed. 754.

After *Mitchell,* numerous other courts, including this one, found the partisan/non-partisan distinction pivotal in resolving disputes under "little Hatch Acts" and analogous provisions. *See, e. g., Alderman v. Philadelphia Housing Auth., supra,* 496 F.2d at 172; *Elder v. Rampton,* 360 F.Supp. 559, 563–64 n. 7 (D.Utah 1972) (three-judge court, per curiam), *aff'd,* 413 U.S. 902, 93 S.Ct. 3062, 37 L.Ed.2d 1020; *Mancuso v. Taft, supra,* 341 F.Supp. at 582, and 476 F.2d at 200; *Gray v. City of Toledo,* 323 F.Supp. 1281, 1287 (N.D.Ohio 1971); *Fort v. Civil Service Comm'n of County of Alameda,* 61 Cal.2d 331, 38 Cal.Rptr. 625, 392 P.2d 385, 388 (1964). It is true that several of these decisions have been drained of some vitality by *Letter Carriers* and *Broadrick,* but to the extent this is so, it is only because they relied on the overbreadth doctrine to provide standing to public employees engaged in *partisan* political activities to raise challenges to the particular acts or charters in question on the grounds that they also prohibited non-partisan political activity. In *Letter Carriers* and *Broadrick,* the Supreme Court rejected this application of the overbreadth doctrine, but the Court by no means indicated that, had standing to challenge the restrictions on non-partisan politics been established, such restrictions would have been upheld.

This case, then, appears to be the first in which a "little Hatch Act" has been challenged not only as facially unconstitutional but also as unconstitutional as applied, thereby obviating recourse to the overbreadth doctrine in order to reach the issue of restrictions on the non-partisan political activities of public employees. Before reaching the merits of the plaintiffs' claim, however, it may be useful to note briefly the key elements of the dilemma posed by government efforts to curtail the political activities of its employees. The dilemma, which was well stated in an official British report over a quarter-century ago, is still with us:

"(i) In a democratic society it is desirable for all citizens to have a voice in the affairs of the State and for as many as possible to play an active part in public life.

"(ii) The public interest demands the maintenance of political impartiality in the Civil Service and a confidence in that impartiality as an essential part of the structure of Government . . . ." Report on the Political Activities of Civil Servants, 12 Reports from the Commissioners, Inspectors and Others 717, paragraph 37 (1949), *quoted in* Esman, *The Hatch Act-A Reappraisal,* 60 Yale L.J. 986, 987 (1951).

In this country, of course, our political freedoms are enshrined in the First Amendment of the Bill of Rights, and they may be curtailed only for the most compelling of state reasons.

In *Mancuso v. Taft, supra,* this Court resolved this dilemma in favor of the political rights of public employees:

"Involved in the present litigation are the First Amendment rights of government employees to freedom of expression, freedom of association, and freedom to petition the government for redress of grievances. '[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.' *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964). Much as the right to vote is a fundamental right, protected because it is the citizen's access to participation in the political processes of his State's legislative bodies, *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and thus the means for pres-

ervation of all other rights, the right to run for public office and engage in political activity would similarly seem to warrant protection."

341 F.Supp. at 581.

The Supreme Court, of course, reached an opposite conclusion regarding government regulation of the partisan political activities of its employees in *Letter Carriers* and *Broadrick, supra.* As noted above, however, the question of the regulation of non-partisan political activities of government employees was left open. The issue now before this Court, then, is whether or not the legal reasoning and policy considerations applied by the Supreme Court to the question of partisan political activities in *Letter Carriers* and *Broadrick* apply with equal strength to the case of non-partisan political activities.

The restrictions on the partisan political activities of federal employees provided by the Hatch Act, according to the Supreme Court in *Letter Carriers*, are justified by "the judgment of history,"

". . . that it is in the best interest of the country, indeed essential, that federal service should depend upon meritorious performance rather than political service, and that the political influence of federal employees on others and on the electoral process should be limited."

413 U.S. at 557, 93 S.Ct. at 2886, 37 L.Ed.2d 796.

The Court then cited several ways in which the uncontrolled partisan activities of government employees could undermine the merit system and the efficient operation of government or disrupt the political process.[7] Chief among them were the dangers of partisan policy making by civil servants, 413 U.S. at 565, 93 S.Ct. 2880; of government inefficiency resulting from distrust or disloyalty within the bureaucracy, *id.* at 557, 93 S.Ct. 2880; of decreasing public

respect for government if the bureaucracy even appeared biased, *id.* at 565, 93 S.Ct. 2880; of a politicized bureaucracy becoming a powerful political machine, *id.*; of the political independence of members of the bureaucracy being threatened by other members of a politicized bureaucracy, *id.* at 566, 93 S.Ct. 2880; and of civil servants using the powers or prestige of their office to influence voters improperly, *id.* at 558, 93 S.Ct. 2880.

In the context of non-partisan political activity, however, several of these dangers disappear and others appear much diminished. In the case of partisan policy making, for example, a civil servant participating in a non-partisan campaign is not committed to a state- or nationwide party platform or philosophy which concerns all areas of political life, and not simply the issues raised in a single campaign, and which could influence his decisions on the job. Similarly the danger of a political machine developing out of a politicized bureaucracy is greatly diminished in non-partisan elections such as the one presented in this case, where the nomination process is taken away from political parties and conducted in open primaries in which candidates run without party identification and independent of candidates running for other offices in the same election. Furthermore, any tendency for such a trend to develop would be stunted by the small number of elections in this country that are non-partisan. After all, the policy behind the Hatch Act's restrictions solely on partisan political activities

"reflects the realities of American party politics where for the most part local party units are the cells of state and even of national party organizations. As a candidate or active worker in local partisan campaigns, a Federal employee would be hard-pressed

---

7. For a discussion of these factors, see Note, *The Supreme Court, 1972 Term*, 87 Harv.L. Rev. 55, 147–48 and n. 34 (1973). *See also* Esman, *The Hatch Act—A Reappraisal*, 60

Yale L.J. 986, 987, 991 (1951); Nelson, *Public Employees and the Right to Engage in Political Activity*, 9 Vand.L.Rev. 27, 42–44 (1957).

not to identify himself with the state and national organization of his party, . . . especially in states operating under the party plan where local office seekers must pledge themselves to support the whole party ticket, including candidates for state and national office."

Esman, *The Hatch Act-A Reappraisal*, 60 Yale L.J. 986, 999–1000 (1951). *See also United Public Workers v. Mitchell, supra,* 330 U.S. at 100, 67 S.Ct. 556, 91 L.Ed. 754, quoted *supra* at 88.

It is true that several of the dangers of partisan political activity discussed by the Supreme Court are also present in a non-partisan context. In a non-partisan election, however, such dangers are greatly reduced in scale. For example, it may still be possible for a civil servant to use the prestige of his or her office to influence voters improperly, but here the influence is for individual candidates, not for a complete slate of candidates and the broad political philosophy of a political party, as such influence might be used in a partisan campaign.

Although the Supreme Court in *Letter Carriers* and *Broadrick* did not specify the precise contours of the standard of review it was applying, the Court clearly acknowledged that Hatch Act-type statutes regulate "political expression which if engaged in by private persons would plainly be protected by the First and Fourteenth Amendments." *Broadrick, supra,* 413 U.S. at 616, 93 S.Ct. at 2918, 37 L.Ed.2d 830. A wealth of Supreme Court decisions makes clear that legislation which burdens First Amendment rights can only be upheld if the state interests it furthers are found to be compelling. *See, e. g., United States v. Robel,* 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed. 2d 508 (1967) ; *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). *See also Reilly v. Noel,* 384 F. Supp. 741, 748 (D.R.I.1974) and cases

cited therein. *Cf. Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). In finding the government interests furthered by the Hatch Act sufficient to sustain the Act's constitutionality in *Letter Carriers,* the Supreme Court was considering all of the above dangers of political activity by government employees present to a significant degree in a partisan context. Since some of those dangers appear to be absent in a non-partisan context, and since those that are present appear to be less destructive of good government and the political process, the state's interest in grossly limiting the activity of its employees in such cases is accordingly diminished and is therefore something less than compelling.

■ This Court recognizes that there may be instances where the state's interest in curtailing even the non-partisan political activities of its employees may be compelling. Nevertheless, as the Supreme Court held in *United States v. Robel, supra,* 389 U.S. at 267–68, 88 S.Ct. 419, a regulation is invalid when there are "less drastic means" by which a statute restricting First Amendment rights could achieve its legitimate goal. *See also Reilly, supra,* at 748. Thus, while a municipality could conceivably argue that it had a compelling interest in limiting even the non-partisan political activities of the Chief of its Fire Department, or in requiring its employees to take a leave of absence before running for even a non-partisan office, a broadly worded provision like the one presently before this Court, which applies to the rookie fireman as well as to the Chief, and which requires resignation, rather than a leave of absence, would clearly not constitute less drastic means.[8]

The defendants argue that, even if a distinction between partisan and non-partisan political activity, such as the one made by this Court, is valid, it would not be determinative in this case

8. For a more extensive discussion of less drastic means in a similar context, see the First Circuit's opinion in *Mancuso v. Taft, supra,* 476 F.2d at 198–200.

because, they maintain, there is no such thing as a non-partisan election; that running for even a non-partisan office is inherently partisan. Defendants also contend, and have presented testimony to the effect, that whether or not in the abstract there can be non-partisan elections, the particular elections in the City of Pawtucket that are in issue here are not *in fact* non-partisan. I must reject both of these contentions.

The defendants' first argument, that all elections are inherently partisan, simply means that in all elections the electorate takes sides and that each of the differing factions has its own, perhaps militant, supporters. But this is to ignore the more technical application of the word as it is used by Congress in the Hatch Act, by the Supreme Court in *Letter Carriers* and *Broadrick,* and by this Court herein, that is, to mean "related to political parties." If Congress were using the word partisan as defendants conceive it, the exception Congress made in the Hatch Act for non-partisan elections would be meaningless.

The defendants' second argument is less easily disposed of. They argue that, while the voting process itself is non-partisan because candidates are not identified on the ballot according to party, the campaigns preceding elections in the City of Pawtucket factually are invariably partisan in nature. In support of this contention defendants presented testimony that the Pawtucket Democratic and Republican parties regularly endorse and campaign on behalf of candidates in city elections; that almost all candidates for public office in Pawtucket seek these endorsements; and that most city council members and at least one past Mayor served on city or ward committees of the Democratic or Republican parties while holding, and presumably running for, public offices designated by the Pawtucket City Charter as being filled through non-partisan elections.

In spite of this evidence, I must conclude that the elections for Mayor and City Council in Pawtucket are non-partisan in more than just name only. Since candidates' party affiliations, if any, do not appear on the ballot, voters who have not been following the campaign closely may not be aware of such affiliations and thus cannot cast their votes on that basis. Similarly, it is much more difficult to vote a straight party ticket, and in fact one witness for the defendants indicated that one of the purposes the City had in adopting the provision was to reduce the likelihood of weak candidates being swept into office on the "coattails" of stronger candidates of the same party. But it is not only in the voting booth that Pawtucket elections take on their non-partisan character. Nomination petitions can be signed by anyone, regardless of party affiliation. The candidates for a given office are nominated in an open primary election in which voters of any party can vote. Pawtucket City Charter, §§ 6–110, 115. For example, in the election for Mayor, only the two candidates who receive the greatest number of votes are placed in the final election. *Id.* § 6–123. Thus unlike a partisan election, where each of the major political parties typically nominates and is officially represented by a candidate in the final election, the non-partisan nomination procedures in Pawtucket can result in a situation where, even though *sub rosa,* in the final election there are two candidates *unofficially* representing one of the major political parties and no candidate representing the other.[9] Finally, there

---

9. As a result of a recent decision by a three-judge panel in this Court holding Rhode Island's election law unconstitutional, *Yale v. Curvin,* 345 F.Supp. 447 (D.R.I. 1972), it is currently possible for voters throughout the state to sign nomination petitions for candidates of either party and to vote in the primary elections of either party. This condition is probably only temporary, as there was testimony that several bills to

is no pattern of automatic party support for candidates for office, regardless of their unofficial party affiliations.

It appears then that elections for municipal offices in Pawtucket, while not completely sterilized from contact with party politics, are in fact substantially non-partisan in character. There is no doubt that political parties play a smaller role in these elections, particularly in the nomination process, then they usually do in typically partisan elections. In view of this reduced role for political parties, the dangers of partisan political activity by government employees outlined by the Supreme Court in *Letter Carriers* are correspondingly diminished and not compelling.

As this Court has frequently stated, the four factors to consider on a request for interim injunctive relief are irreparability of injury to the plaintiffs, a balancing of the injury, the probability of plaintiffs' success on the merits, and preservation of the status quo. *See, e. g., Dempsey v. McQueeney*, 387 F. Supp. 333 (D.R.I.1975); *Palmigiano v. Travisono*, 317 F.Supp. 776 (D.R.I. 1970). As to the first and last factors, it must be observed that, absent an injunction, at 5:00 p. m. on September 17, 1975, plaintiffs will have to choose between candidacy for public office on the one hand or the criminal and civil sanctions of the Pawtucket City Charter on the other. Furthermore, the foregoing resolution of the question of the likelihood of success on the merits in plaintiffs' favor itself required a balancing of plaintiffs' First Amendment interests as against the City's interests in keeping its employees out of the electoral process, and this factor as well must be resolved in plaintiffs' favor. The Court therefore concludes that the criteria for the issuance of a preliminary injunction have been satisfied.

Plaintiffs shall prepare an order accordingly.

replace the Act declared unconstitutional are now pending before the Rhode Island General Assembly. In any case, in partisan elec-

tions each party is still able to nominate its own candidate.