David WULP et al., Plaintiffs-Appellants,

v.

John H. CORCORAN, City Manager, City of Cambridge, Massachusetts, et al., Defendants-Appellees.

No. 71-1214.

United States Court of Appeals, First Circuit.

Heard Oct. 6, 1971.

Decided Jan. 11, 1972.

**828**

Francis John Stolarz, Cambridge, Mass., with whom Matthew H. Feinberg, Boston, Mass., was on brief, for appellants.

Michael J. Lack, Cambridge, Mass., with whom Philip M. Cronin and Withington, Cross, Park & Groden, Boston, Mass., were on brief, for appellees.

Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

Plaintiffs brought this action in the district court pursuant to 42 U.S.C. § 1983 to challenge the constitutionality of City of Cambridge General Ordinances, Chap. 22, Sec. 2, which requires anyone who wishes to sell newspapers and certain other articles on the streets of Cambridge to first obtain a permit and badge from the board of license commissioners.[1] Plaintiffs Wulp, Singer and Ullman sue individually and on behalf of the Socialist Workers Party of Massachusetts; plaintiff O'Kelly sues on his own behalf. Defendants are the appropriate city officials. According to the complaint and affidavits filed in connection with the district court proceedings, plaintiff Wulp asserts that fear of arrest and other forms of harassment by the defendants have kept him from attempting to distribute newspapers, leaflets or magazines in Cambridge. Plaintiffs Singer, Ullman and O'Kelly each allege that he or she has

---

1. Chapter 22, Sec. 2 of the City of Cambridge General Ordinances provides as follows:

"*Articles which may not be hawked or peddled: fee for badge*

No person shall hawk or peddle any of the articles enumerated in 3 A.L.M., c. 101, S. 17, to wit: newspapers, ice, flowering plants, and such flowers, fruits, nuts, and berries as are wild or uncultivated until he shall have obtained a permit and badge from the board of license commissioners. No fee shall be charged for the permit, but a charge of seventy-five cents shall be made for the badge."

Persons who apply for a permit are fingerprinted by the Cambridge Police Department and a check is made to see if such persons have any sort of criminal record (O'Kelly Affidavit).

been prevented by unidentified Cambridge police officers on one or more occasions from distributing leaflets or newspapers due to lack of a permit and Singer has also been threatened with arrest under the ordinance.[2] Plaintiff O'Kelly further alleges that he attempted to obtain the required permit but that his application was denied because of a prior criminal record.[3] All of the plaintiffs have said that they desire to distribute printed material on the streets of Cambridge and would do so if freed from fear of arrest or harassment by the defendants acting under color of the challenged statute. After a hearing, the district court denied plaintiffs' motion for summary judgment and dismissed the complaint, relying chiefly on Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971). Plaintiffs appeal. Appellees do not dispute any facts alleged in the pleadings or affidavits but say simply that we should abstain from reaching a decision on the merits. Were it not for Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L. Ed.2d 669 (1971), and associated cases, *see* n. 4 *infra*, both we and the district court would have summarily granted the requested relief on the squarely applicable precedent of Strasser v. Doorley, 432 F.2d 567 (1st Cir. 1970). As it is, we reexamine the propriety of our reaching the merits with perhaps an overabundance of caution.

A. Standing

The traditional test of standing, of course, is whether there is a sufficient nexus between the status of the individual plaintiffs and the deprivations allegedly flowing from the existence of the regulation being challenged. Flast v. Cohen, 392 U.S. 83, 102, 88 S.Ct. 1942,

20 L.Ed.2d 947 (1968). The defendants convinced the district court that even conceding plaintiffs' standing in this traditional sense, a proper exercise of the discretion inherent in the federal judiciary's equity jurisdiction required dismissal of plaintiffs' complaint. The defendants' argument, based on their interpretation of the Supreme Court's holding in Boyle v. Landry, *supra*, is that in the absence of a showing of immediate irreparable injury the City of Cambridge should be permitted to enforce the ordinance in question in the normal manner with the expectation that whatever constitutional rights plaintiffs possess will be fully and adequately vindicated in any eventual prosecution under the ordinance. We agree that Boyle v. Landry is relevant to proper resolution of the issue now before us, but we derive somewhat different lessons from the case than those advanced by defendants and accepted below.

The Supreme Court in Boyle v. Landry reacted against what appeared from the record to have been a search by plaintiffs through state statute books and city ordinances with a view to picking out those which might sometime in the future be used improperly against them. None of the plaintiffs had ever been threatened with arrest or actually arrested, charged or prosecuted under the particular intimidation statute held by the three-judge court to contain a constitutionally impermissible provision. These circumstances, the Court concluded, amounting to little more than "speculation about the future", did not provide a sufficiently compelling predicate to federal intrusion into the state criminal process. 401 U.S. at 81, 91 S.Ct. 758.

2. After plaintiff Ullman was twice prevented from distributing printed material in the Harvard Square area of Cambridge by uniformed Cambridge policemen, she applied for and was issued a "Hawkers' and Peddlers' Permit". That permit has now expired and she chooses to challenge the ordinance rather than apply for a renewal.

3. According to the affidavit filed by plaintiff O'Kelly, his criminal record at the time of his application for a permit and badge consisted of an arrest and conviction for the possession of marijuana and for violating a Boston park regulation concerning the distribution of newspapers on park grounds.

Although at several points in the Court's opinion in Boyle v. Landry Justice Black emphasized the absence of an "irreparable injury" to the constitutional rights of plaintiffs, the dispositive aspects of the decision related to plaintiffs' lack of standing or, perhaps more precisely, to the absence of the requisite "case or controversy". The "irreparability of injury" language in the opinion was used to highlight that failing. In Younger v. Harris, *supra,* to which Justice Black explicitly referred in Boyle v. Landry for a fuller explanation of the basis of the latter decision, the Court reaffirmed the importance of resolving only "concrete disputes brought before the courts for decision. . . ." 401 U.S. at 52, 91 S.Ct. at 754. Applying this requirement to the plaintiffs in *Younger* led the Court to decide that three of the plaintiffs there had not alleged facts sufficient to confer standing. The Court noted that feelings of "inhibition", without any claim of a threat of prosecution, or that a prosecution was likely or even remotely possible, are entirely too "imaginary or speculative" to establish standing. 401 U.S. at 42, 91 S.Ct. 746. Since the plaintiffs in Boyle v. Landry were nearly indistinguishable from those who had been found to lack standing in Younger v. Harris, identical disposition of the two cases was clearly appropriate.

■ The present case is readily distinguishable. At least three of the plaintiffs here, Singer, Ullman and O'Kelly, have been prevented by defendants or their agents from distributing printed materials on the streets of Cambridge because they did not have a permit; defendants have denied plaintiff O'Kelly a permit; and Singer has been threatened with arrest under the ordinance if she continues to distribute material without a permit. Although none

of the plaintiffs has been actually arrested or prosecuted under the challenged ordinance, that fact is not dispositive. *See, e. g.,* Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). We know of no principle of federal constitutional law which requires persons in the position of plaintiffs to actually violate a statute or ordinance, with the risks that such a course necessarily entails, before being allowed to assert fundamental constitutional rights. *See, e. g.,* Perez v. Ledesma, 401 U.S. 82, 102–103, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971) (Brennan concurring in part and dissenting in part); Epperson v. Arkansas, *supra,* 393 U.S. at 101–102, 89 S.Ct. 266; Pierce v. Society of the Sisters, etc., 268 U.S. 510, 535–536, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Anderson v. Vaughn, 327 F.Supp. 101, 103 (D.Conn. 1971) (three-judge court). *Cf.* Abbott Laboratories v. Gardner, 387 U.S. 136, 148–156, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). In short, we are satisfied that at least some of the plaintiffs here have standing, especially since their challenge involves facial unconstitutionality without the possibility of a limiting construction that would allow the core of the ordinance to be upheld as constitutional. *See, e. g.,* Epperson v. Arkansas, *supra;* Strasser v. Doorley, *supra,* 432 F.2d at 568, and cases cited therein.

### B. Equity Jurisdiction

■ This is not an end to the inquiry. The *Younger* family of cases specifically and repeatedly reserved the question whether the same standards governing abstention would apply in cases in which there is no pending state prosecution.[4] While it might be sufficient in the instant case merely to adhere to prior law, still intact, in preference to trying to anticipate future directions, we deem it useful to reexamine

4. Younger v. Harris, 401 U.S. 37, 41, 54–55, 91 S.Ct. 746, 27 L.Ed.2d 669 (Stewart and Harlan concurring) (1971); Samuels v. Mackell, 401 U.S. 66, 73–74, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); Dyson v. Stein, 401 U.S. 200 (1971), and Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971).

the significance of the pendency of a state prosecution as a factor bearing on a federal court's abstention.[5]

One set of circumstances lending significance to the fact that a federal action has been instituted subsequent to a state prosecution is of a highly demonstrable and pragmatic nature. The undisputed costs of stopping an ongoing state proceeding and reinstituting the action in the federal courts—measured, for example, by duplication of efforts and in time lost—necessarily result in the clear expression of a lack of confidence by federal courts in the capacity or the willingness of state courts to vindicate federal constitutional rights. This gratuitous indictment of state processes and the extra expenses are not involved when an action is pending in neither system and the federal courts merely consent to hear federal constitutional claims in advance of a state hearing on those claims.

■■ A second basis for attributing significance to the fact that a state prosecution is or is not pending when the federal action is filed is less demonstrable but no less important. It is that the possible sources of injury to fundamental constitutional rights are less identifiable and correctable before the state has actually geared up its prosecutorial processes. From the point of view of the applicant for federal relief, the pendency of a criminal prosecution is graphic proof of the priority given the case within the state system. *Cf.* Younger v. Harris, *supra*, 401 U.S. at 55 n. 2, 91 S.Ct. 746 (Stewart and Harlan concurring). Once the state has initiated its processes, it can be expected in the great majority of cases to press the matter with some expedition. When no prosecution is pending, there is no guarantee that prosecution and a chance for ultimate vindication of constitutional claims will quickly follow on the heels of a violation of the state statute. Given the enormous demands on the scarce prosecutorial resources of most states and the legitimate hope that the mere existence of statutes may stimulate obedience (*see* Perez v. Ledesma, *supra*, 401 U.S. at 118–120, 91 S.Ct. 674 (Brennan concurring in part and dissenting in part)), states may well choose to play a waiting game, leaving those in the position of plaintiffs here in limbo. Finally, especially in dealing with facially unconstitutional state statutes, an attempt by federal courts to defer to the states by abstaining—even before a prosecution has been instituted—is not true deference because, at base, it amounts to telling the plaintiff that he must start all over again, and in most cases, by deliberately flouting a state or local law. The burden on fundamental rights of requiring exposure to criminal penalties that may well cumulate if prosecution is delayed may not, in itself, be sufficient to establish irreparable injury (*cf.* Younger v. Harris, *supra*, 401 U.S. at 51–52, 91 S.Ct. 746), but if present it is an important factor contributing to that conclusion. *See, e. g.*, Hull v. Petrillo, 439 F.2d 1184, 1186–1187 n. 1 (2d Cir. 1971).[6] *See also* Anderson v. Vaughn, *supra*, 327 F.Supp. at 103.

5. The federal anti-injunction statute, 28 U.S.C. § 2283, by its terms, applies only to proceedings that have been instituted in a state court at the time the federal suit is brought. Federal intervention at that point is limited to three sets of circumstances: (1) "as expressly authorized by Act of Congress"; (2) "where necessary in aid of [the court's] jurisdiction"; and (3) "to protect or effectuate [the court's] judgments." Courts have also recognized a fourth exception justifying intervention in such cases, i. e., where there has been an adequate showing of "irreparable injury". *See, e. g.*, Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The Court undertook principally in Younger v. Harris and its companion cases, *supra* at note 4, to reemphasize the narrow scope of the latter exception.

6. While, as the magistrate noted below, there is here no such bad faith harassment of plaintiffs invoking a nonapplicable ordinance as there was in *Hull*, we have every likelihood of continued threats, though possibly in good faith, to enforce an applicable but facially unconstitutional

**832**

■ In sum, there is a clear and significant difference in the appropriateness of federal relief between pending and pre-prosecution contexts. The policies militating against intervention, canvassed in Younger v. Harris, *supra*, 401 U.S. at 43–44, 91 S.Ct. 746, do not apply at all or apply with greatly diminished strength in the latter context. The traditional restraint of equity, calculated to prevent erosion of the role of the jury and avoid a duplication of legal proceedings is not here present. And considerations of comity do not push nearly so strongly where there is no ongoing state proceeding to be aborted. *See, e. g.,* Kennan v. Nichol, 326 F.Supp. 613, 615–616 (W.D.Wis.1971).

■ The question remains: does the same rigorous standard of "great and immediate" harm as defined in *Younger* apply to a case when no state prosecution is pending but there is every reasonable expectation that a violation would be criminally prosecuted? That is, must a plaintiff in such a case show bad faith and harassment, injury more than that incidental to any criminal proceeding, chilling effect more than that stemming from any vague or overbroad law regulating expression and more than

the minor impact on speech incidental to a law regulating conduct? If so, then we would have to concede that there is no room left for the use of the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, in testing state and federal criminal statutes. While Mr. Justice Brennan's views in Perez v. Ledesma, 401 U. S. at 93, 91 S.Ct. 674 et seq., did not prevail in view of the majority's recognition of a prior pending state prosecution, 401 U.S. at 86 n. 2, 91 S.Ct. 674, we cannot dismiss the Congressional history reviewed by him, 401 U.S. at 112–115, 91 S.Ct. 674, expressly contemplating resort to the milder, less intrusive, and more timely remedy of a declaratory judgment to test criminal laws, both state and federal.[7] *See, e. g.,* Lewis v. Kugler, 446 F.2d 1343, 1347–1348 (3d Cir. 1971); Anderson v. Vaughn, 327 F.Supp. 101, 102 (D.Conn.1971) (three-judge court). Were the law to be that a plaintiff could not obtain a declaratory judgment that a local ordinance was unconstitutional when no state prosecution is pending unless he could allege and prove circumstances justifying a federal injunction of an existing state prosecution, the Federal Declaratory Judgment Act would have been *pro tanto* repealed.[8]

ordinance. The harassment is no less, though done without bad faith, and the irreparability of injury on the present facts are the same. Even when there is a pending state prosecution, the Court in Younger v. Harris, *supra*, noted that "[t]here may, of course, be extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment." 401 U.S. at 53, 91 S.Ct. at 755. *See also id.* at 56, 91 S.Ct. 746 (Stewart and Harlan concurring). We are at least satisfied that those "extraordinary circumstances" are present here where there is no pending state prosecution and there is no possible limiting construction that could save the statute being challenged. *See* Strasser v. Doorley, *supra. See also* Taylor v. City of Selma, 327 F.Supp. 1191 (S.D.Ala. 1971) (three-judge court); Sweeten v. Sneddon, 324 F.Supp. 1094, 1100–1105 (N.D.Utah 1971).

7. Even when a state criminal prosecution is pending, the majority in Samuels v. Mackell, *supra*, recognized that "[t]here may be unusual circumstances in which an injunction might be withheld because, despite a plaintiff's strong claim for relief under the established standards, the injunctive remedy seemed particularly intrusive or offensive; in such a situation, a declaratory judgment might be appropriate and might not be contrary to the basic equitable doctrines governing the availability of relief." 401 U.S. at 73, 91 S.Ct. at 768.

8. The Court in Samuels v. Mackell, *supra*, expressly resisted passing on the propriety of declaratory relief when no state prosecution had been initiated at the time the federal suit was brought. 401 U.S. at 73–74, 91 S.Ct. 764. We express no opinion on the propriety of federal relief when there is no state prosecution pending against any of the plaintiffs bringing the

**C. Abstention: Railroad Comm'n of Texas v. Pullman Co.**

Abstention would still be proper, for somewhat different reasons (*see* Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941)), if there were some likelihood that a decision could be rendered on state law grounds that would obviate the need for a federal constitutional decision or would present the federal constitutional issue in significantly altered light. *See, e. g.*, Wisconsin v. Constantineau, 400 U.S. 433, 437–439, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); Reetz v. Bozanich, 397 U.S. 82, 85–87, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970); Harman v. Forssenius, 380 U.S. 528, 534–535, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); McNeese v. Board of Educ., 373 U.S. 668, 673–674, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963).

Although brought to our attention by neither party, Mass.Ann.Laws ch. 101, § 17 (1967), appeared on our first reading to afford a possible state law basis for vindication of plaintiff's claims.[9] Section 17 provides in relevant part that "[h]awkers and pedlers may sell without a license newspapers . . .. The aldermen or selectmen may by regulations, not inconsistent with this chapter, regulate the sale or barter . . . of said articles without the payment of any fee. . . ." This section might at first reading imply that state law forbids the local licensing of newspaper vending, without and especially with a fee requirement. But close reading of all of chapter 101 and of the relevant state cases reveals that the licenses referred to in section 17 of the state statute are the local and state "transient vendor" licenses which are issued after the payment of both state and local fees based on the average quantity and value of goods expected to be kept and exposed for sale.[10] 18 H. Hardy, Mass. Practice-Municipal Law and Practice § 320 (2d ed. 1971). The statute does not prohibit city ordinances which attempt to regulate the sale of newspapers and other printed materials, even though such regulation includes the requirement of a permit and badge, at least so long as no fee is charged for the municipal permit and other eligibility conditions are not attached which would make the municipal permit the equivalent of the state license. *See, e. g.*, Commonwealth v. Akmakjian, 316 Mass. 97, 98–99, 55 N.E.2d 6 (1944); Commonwealth v. Pascone, 308 Mass. 591, 597–598, 33 N.E.2d 522, cert. denied, Pascome v. Commonwealth of Massachusetts, 314 U.S. 641, 62 S.Ct. 82, 86 L.Ed. 514 (1941). Even though the Massachusetts courts might filter some of the impurities of the Cambridge ordinance on state statutory grounds, however, this would not eliminate all of plaintiffs' grievances.[11] The Supreme Court has repeatedly instructed federal courts confronting constitutional claims arising in this posture to decide the case before them rather than to force plain-

---

action in federal court, but a state prosecution under the challenged statute has begun against an unrelated third party.

9. Mass.Ann.Laws ch. 101, §§ 13–17, 21 and 32 are reprinted on the back of the "Hawkers' and Peddlers' Permit" issued by the City of Cambridge.

10. The state requirements for local transient vendor licenses are set out primarily in Mass.Ann.Laws ch. 101, § 5 (1967). Conditions and procedures for obtaining a state "hawkers' and pedlers' license" are set out primarily in Mass.Ann.Laws ch. 101, §§ 3 and 22 (1967).

11. We acknowledge that the Massachusetts courts might outlaw the fee aspect of the Cambridge ordinance as an implicit violation of Mass.Ann.Laws ch. 101, § 17, despite defendants' contention that 75 cents covers only the city's actual cost of providing the badges and is not a "license fee". It is also within conjecture that the policy of denying newspaper permits to persons with criminal records would not stand up against the explicit exemption of vendors of section 17 items from the "good repute" requirements of Mass.Ann.Laws ch. 101, § 22 (1967). But rulings favorable to plaintiffs on these issues would not dispose of the basic claim that any license requirement conflicts with the anonymity permitted those who would monger their views to the public. *See* text *infra*.

tiffs to first attempt to vindicate those federal rights in state courts. *See, e. g.*, Reetz v. Bozanich, *supra*, 397 U.S. at 86–87, 90 S.Ct. 788; Zwickler v. Koota, 389 U.S. 241, 251, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Harman v. Forssenius, *supra*, 380 U.S. at 534–535, 85 S.Ct. 1177.

## D. Merits

■ As to the merits of the case, although the district court regarded itself precluded by Boyle v. Landry from passing on plaintiff's constitutional claims directly, it did caution the Cambridge authorities to "give very careful consideration to any proposed or prospective prosecution under this Ordinance" because "it is just about assured that if this case were to be decided on the merits, that the Ordinance would be declared unconstitutional." The Cambridge ordinance at issue here is almost identical with the Providence ordinance which we recently invalidated in Strasser v. Doorley, *supra*. Even if a state court were to find the fee aspect of the city ordinance and the apparent practice of the board of license commissioners in refusing to grant a permit to certain applicants to be invalid under the state licensing statute so as to leave no discretion in withholding or denying a permit and badge, we would still be left with the basic question posed and answered negatively in *Strasser*: that is, "whether the physical acts of registering and of procuring and wearing a badge can constitutionally be required of a newspaper vendor . . . ." 432 F.2d at 569. As the Supreme Court noted in

Talley v. California, 362 U.S. 60, 80 S. Ct. 536, 4 L.Ed.2d 559 (1960), printed materials distributed anonymously "have played an important role in the progress of mankind." *Id.* at 64, 80 S.Ct. at 538. In the absence of an important governmental interest—not advanced here—that would be served by forced identification, with the consequent fear of reprisals that such identification may well entail, we hold that the Cambridge ordinance may not stand.[12] *Cf.* Bates v. Little Rock, 361 U.S. 516, 523–527, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); N.A.A.C.P. v. Alabama, 357 U.S. 449, 462 (1958); *see also* Thomas v. Collins, 323 U.S. 516, 527 n. 12, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945).

■ One further point raised by the defendants deserves mention. In oral argument, defendants argued that although the Cambridge ordinance is broadly written it is in practice used only to control traffic in Harvard Square. According to the defendants, sellers of printed material on streets elsewhere in the city are allowed to distribute their material without a permit or badge and without any sort of police interference. While traffic control may be a legitimate governmental objective (*see, e. g.*, Shuttlesworth v. City of Birmingham, Alabama, 394 U.S. 147, 89 S. Ct. 935, 22 L.Ed.2d 162 (1969)), there are means available to the City of Cambridge for accomplishing such an objective which do not impose the sort of restrictions of First Amendment rights as are involved here.[13] *See, e. g.*, Jamison

12. Because of our holding that in the absence of an overriding governmental objective Cambridge may not force persons who wish to sell printed materials on the streets of the city to register and wear a badge, and because the fee and discretionary aspects of the ordinance may be invalid under the state licensing statute, *see* note 11 *supra*, we see no reason to deal extensively here with either of those aspects of the ordinance. We note in passing, however, that we struck down similar aspects of the Providence ordinance in Strasser v. Doorley, *supra*. *See*

*also* Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938); Grosjean v. American Press Co., 297 U.S. 233, 244–245, 56 S.Ct. 444, 80 L.Ed. 660 (1936); Hull v. Petrillo, 439 F.2d 1184, 1185–1186 (2d Cir. 1971).

13. It may also be argued, though defendants here have not, that an ordinance such as the present one can be constitutionally applied to regulate the distribution of printed materials which are themselves primarily commercial in nature or to regulate the distribution of non-com-

v. Texas, 318 U.S. 413, 416, 63 S.Ct. 669, 87 L.Ed. 869 (1943); Schneider v. State, 308 U.S. 147, 161–163, 60 S.Ct. 146, 84 L.Ed. 155 (1939). *Cf.* Talley v. California, *supra*, 362 U.S. at 62–64, 80 S.Ct. 536.

■ The district court's dismissal of plaintiffs' complaint must therefore be reversed. In view of the present posture of the case, presenting controlling issues of law and no significant disputes of fact, we hold Chapter 22, Sec. 2 of the City of Cambridge General Ordinances invalid insofar as it requires those persons wishing to sell printed materials in Cambridge first to obtain a permit and badge from the board of license commissioners. 28 U.S.C. § 2201. Since there is no evidence before us that would indicate that defendants will not accept in good faith this final determination of the ordinance's unconstitutionality, we affirm so much of the district court's order which denied plaintiffs' motion for a permanent injunction. *See* Strasser v. Doorley, *supra*, 432 F.2d at 569–570.

mercial printed matter undertaken primarily for commercial ends. *See, e. g.,* Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942) (ordinance prohibiting distribution of "commercial and business advertising matter" on city streets upheld as applied to distributor of handbill advertising submarine exhibition to which admission charged); Breard v. City of Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951) (ordinance prohibiting unannounced door-to-door solicitation of sales of "goods, wares and merchandise" upheld as applied to magazine salesman). *See also* Thomas v. Collins, 323 U.S. 516, 538–543, 65 S.Ct. 315, 89 L.Ed. 430 (1945). The short answer to this argument here is that the scope of the Cambridge ordinance is not so limited. *See, e. g.,* Cantwell v. Connecticut, 310 U.S. 296, 307–308, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

Quite apart from overbreadth, it can no longer be seriously contended that the mere fact that newspapers such as those which plaintiffs wish to distribute are offered for sale rather than distributed free of charge dilutes the protection otherwise afforded by the First Amendment. Whatever room for doubt there may once have been on this score was removed by Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959). The Court in that case stated with respect to the First Amendment rights of a bookseller charged with violation of a state obscenity statute that "[i]t is of course no matter that the dissemination takes place under commercial auspices." *Id.* at 150, 80 S.Ct. at 217. In New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Court reaffirmed its allegiance to this view by giving full First Amendment protection to a newspaper which had accepted a paid advertisement alleged to be libelous. *Cf.* Martin v. Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); Grosjean v. American Press Co., *supra. See also* Note, Freedom of Expression in a Commercial Context, 78 Harv.L.R. 1191 (1965).