**Debra DEMPSEY et al.**

v.

**Walter McQUEENEY, Individually and in his capacity as the Chief of Police of the City of Providence, et al.**

**Civ. A. No. 74–275.**

United States District Court,
D. Rhode Island.

Jan. 3, 1975.

Ralph Gonnella and Thomas C. Angelone, Providence, R. I., for plaintiffs.

V. Paul McGinn, Asst. City Sol., Everett Sammartino, Asst. U. S. Atty., Providence, R. I., for defendants.

## OPINION AND ORDER

PETTINE, Chief Judge.

Plaintiffs bring this action for declaratory and injunctive relief against the Chief of the Providence City Police and various of his subordinates, and a number of other defendants whose conduct is not the subject matter of this particular aspect of the proceeding.[1]    Plaintiffs

---

1. These defendants are Richard P. Sullivan and John Doe (1–10), all members of the Rhode Island State Police, and Jon Lussier, an agent for the Internal Revenue Service of the United States Government.

are employees and patrons of D & F Enterprises, Inc., and D & F Enterprises, Inc., ("D & F"), which does business as the Gemini Hotel (sometimes hereinafter referred to as "the Gemini") in Providence, Rhode Island. They claim that from April, 1974 to the present, the defendants have been engaged in a campaign to harass and intimidate them and to disrupt business at the Gemini Hotel in violation of plaintiffs' rights under the Fourth, Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred on the Court pursuant to 28 U.S.C. §§ 1343, 1361, and 2201 et seq. The alleged activities consist in pertinent part of repeated entries by members of the Providence Police Department into the business premises of the Gemini Hotel to "therein take into custody employees and patrons of said establishment and threaten others on the premises to disperse upon pain of being taken into custody." (Verified Complaint, paragraph 16). Those detained are taken to the police station, kept there for two hours and then released without being formally charged. Plaintiffs assert that the police activities challenged take place with such frequency and similarity as to establish a pattern of conduct which is pursued in bad faith.

Both plaintiffs and defendants contend that the police activity in question has been undertaken pursuant to R.I.G.L. § 12–7–1 (1969 Reenactment) which provides:

"12–7–1. Temporary detention of suspects.—A peace officer may detain any person abroad whom he has reason to suspect is committing, has committed or is about to commit a crime, and may demand of him his name, address, business abroad and whither he is going; and any such person who fails to identify himself and explain his actions to the satisfaction of such peace officer may be further detained and further questioned and investigated by any peace officer; provided, in no case shall the total period of such detention exceed two (2) hours, and

such detention shall not be recorded as an arrest in any official record. At the end of any such detention period the person so detained shall be released unless arrested and charged with a crime."

There is no question that the police sought to fit their actions within the confines of § 12–7–1 by releasing, within two hours or less without criminal charges, all those taken into custody at the "Gemini." The plaintiffs seek to enjoin the police conduct and to have § 12–7–1 declared unconstitutional both as applied and on its face by a three-judge court. Thus § 12–7–1 lies at the very heart of this controversy.

### Justiciability

A hearing was held in this matter on December 6, 1974, wherein both employees and owners of the "Gemini" and members of the Providence Police Department testified. The following facts are not in dispute. Since at least April of 1974, uniformed members of the Providence police force, acting under the direction of Colonel Walter McQueeney, Chief of Police, have repeatedly entered the bar area of the Gemini Hotel, usually between the hours of eight and ten p. m. These activities have been intensified within the last four to six weeks. Frank W. DeLuca, 50% stockholder of "D & F", testified that the police had raided the hotel between eight and twelve times in the two weeks preceding institution of this action. On each occasion, a number of the women patrons and employees present in the bar were taken into police custody and transported to the police station which houses the "C Squad," that is, the detective division. Sometimes the women so detained were questioned prior to their removal; sometimes they were not. The last such incident occurred on December 4, 1974, two days before the instant action was filed. Plaintiff Jackie Sue Odom, a waitress at the "Gemini" for four years, testified that she has been "picked up" by the police and detained for approximately two hours

more than twenty times during the course of her employment and two times (November 26 and December 4) in the two weeks preceding the filing of the instant action. She further testified that Major Stephen Moroney, the night commander of the police force up to three weeks before the hearing, stated to her on November 26, 1974, that "We are going to be in there [the Gemini Hotel] every night until you get tired, quit, or leave town." While the police deny that their conduct constitutes or is intended to be harassment, the testimony of Colonel McQueeney, Major Moroney and Detective William Dwyer, a participant in many of the raids, confirms plaintiffs' allegations that, absent an injunction, the police will continue to follow Colonel McQueeney's standing orders to "pick up girls at the Gemini" as part of the Department's "investigation" and "war" on prostitution. I therefore conclude that plaintiffs Dempsey, McCoy, and Odom have amply demonstrated the existence of a "live and acute controversy," and their standing to challenge § 12–7–1 and the police activity undertaken pursuant to it.[2] Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); Wulp v. Corcoran, 454 F.2d 826 (1st Cir. 1972); cf. Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971).

### Findings of Fact

The Providence Police Department, under the direction of its Chief, Colonel McQueeney, has long suspected the Gemini Hotel of being a house of prostitution. These suspicions are based primarily on evidence gathered by the Colonel from two women who claim to have been involved in such activities at the "Gemini." Although he did not feel he could divulge information in open court which he believed conclusive on the "Gemini's" involvement in prostitution, Colonel McQueeney was quite insistent that he had such proof readily available,

indeed, in his pocket. Colonel McQueeney testified that he had first received information relating to prostitution at the "Gemini" "a long time back" and that it has been "under investigation" for the past year. Yet for reasons upon which this Court would not care to speculate, Colonel McQueeney has chosen, for the present at least, not to present this information to a grand jury. Instead, he testified, within the last four to six weeks he has ordered police officers to conduct further investigations and to "pick up girls" at the hotel.

I find that Colonel McQueeney's orders were both given and received with the understanding that the Providence Police were to conduct regular "raids" at the "Gemini" between the hours of eight and ten p. m.; that by way of threats to take into custody all who remained on the premises and, after a command to disperse, by indiscriminately taking women at the "Gemini" into custody, the police, pursuant to Colonel McQueeney's orders, hoped to disrupt business and frighten off patrons. I find that under the pretext of "investigating" prostitution at the "Gemini," the police sought to utilize Rhode Island's temporary detention law (R.I.G.L. § 12–7–1) to intimidate and harass women employees and patrons of the "Gemini" by arbitrarily detaining them at the police station for periods up to two hours where they were subjected to repetitious questioning and, at least initially, fingerprinting and photographing, although the police at no time contemplated lodging criminal charges against those so detained. These findings of fact are based on the testimony not only of plaintiffs' witnesses, but also that of the defendants, which in large part corroborates plaintiffs' factual allegations although disputing the motivation to be ascribed to the conduct. Colonel McQueeney testified that he had ordered his men to investigate and "pick up girls" at the "Gemini" within the last

---

2. Plaintiffs' DeLuca and D & F Enterprises, Inc. standing to sue under Counts II through V of the Complaint is not considered herein.

four to six weeks. Based on the testimony of Frank DeLuca, John Lanphere, a bartender there five nights a week, and Jackie Sue Odom, I find that within the two weeks prior to the filing of this suit, members of the Providence police force came into the "Gemini" on eight to twelve separate occasions between the hours of eight and ten p. m. The number of policemen involved varied; on November 26, six policemen entered. Upon entry, the police made such comments as: "The heat's on"; "We are going to show you girls who's running the place"; and "We've got to pick up some girls tonight, but we'll get you back early so you can go back to work" (Odom). On December 1, Mr. Lanphere heard one policeman announce: "I'll be back later. If there are any girls around this bar, I'll take them to the station." On November 26, Ms. Odom heard Major Moroney announce to all women present in the bar at the "Gemini": "You have two choices: either leave now or spend the night in jail." As a consequence, all the women left.

The women who were "picked up" in connection with the raids on the "Gemini" were subjected to little or no questioning prior to being transported to the police station. The testimony developed that "new faces" and girls sitting around the bar who wore skirts "way up" and/or no brassieres under their outer garments were to be picked up. The one common feature of all these detainees was that they were found in the "Gemini." No meaningful attempt was made to conduct field interrogation or to determine if the individual woman to be detained was suspected of criminal activity; merely being in the "Gemini" and female was sufficient to subject one to the risk of detention. Moreover, I find that no investigatory purpose was served by the detention at the station. Detective Dwyer testified that he personally had picked Ms. Odom up and taken her to the station three to five times or more within a two month period, and that the only questions he asked were as

to her name, age, address and distinguishing marks.

I can conceive of no legitimate reason to explain the police conduct in repeatedly bringing Ms. Odom to the police station to ask for her name, age and whereabouts. There may indeed be instances where proper investigation warrants a second or third interrogation of an individual, but common sense dictates that on the second occasion, new questions would be asked or old answers challenged. Yet neither was done in Ms. Odom's case. Similarly, Major Moroney stated he had spoken with women brought into the station on two and three different occasions. I find that the phrase "pick up some girls" invariably meant to bring them to the station regardless of the results of field interrogation, if any indeed was conducted. Invariably, the women so detained were locked up for two hours and then released without being charged. Furthermore, police comments such as "We've got to pick up some girls tonight, but we'll get you back early so you can go back to work" demonstrate that from the outset the police knew that women were to be temporarily detained and that the detention contemplated had no relation to any continuing investigation of the detainee. In sum, I can only conclude that the sole purpose of the raids was to disperse the females at the "Gemini" by intimidating some of the women into dispersing and by keeping others temporarily off the streets. This finding is poignantly supported by the experience of Ms. Odom who, in the four years she has worked at the "Gemini" as a waitress, has been picked up and temporarily detained by the police over twenty times but formally charged with prostitution only once, and that when she was eight months' pregnant. The police attitude toward these raids was unmistakably expressed by Major Moroney. Ms. Odom testified that on November 26, 1974, he stated to her: "Haven't you seen the [news]papers? Are you stupid? We are going to be in there every night until you get tired,

quit or leave town." Similarly, at a hearing of the Rhode Island State Liquor Control Administration to review the Gemini Hotel liquor license, Major Moroney explained for the record: "When they [prostitutes] are driven into the street, there is more of a chance to get caught . . . You can stop prostitution on the streets by keeping on harassing them." [3]

This Court does not want to convey that Major Moroney acted out of any personal ill will. On the contrary, his demeanor and testimony indicated a strong subjective sense of morality. This can be no justification for the police conduct in this case. As Justice Holmes once said in response to doing justice, "That is not my job. My job is to play the game according to the rules." I feel constrained to utter the obvious, that there can be no justice except under the rule of law. Subjective morality in law enforcement does violence to this axiom.

■ However legitimate the police suspicion that the Gemini Hotel is a house of prostitution, the pattern of police raids challenged here in no way furthered its investigation. On the contrary, I must conclude that the raids were undertaken in an attempt to undermine the suspected operation by use of summary punishment rather than to uncover evidence to present to a grand jury. Whether the purpose of these raids was to retaliate for some deficiency which prevents the police from presenting a case to the grand jury or rather due to a sincere belief that it is the only effective way to shut down the operation is of no moment to this inquiry. I must in either case find that the plaintiffs have demonstrated a pattern of police conduct calculated to harass and intimidate and carried out in bad faith in an attempt to circumvent the criminal process by misusing § 12–7–1 as a means to inflict summary punishment.

### Comity

■ Whenever litigants seek to enjoin police action ostensibly authorized by a state criminal statute, questions of comity, equity and abstention as considered by the United States Supreme Court in the Younger v. Harris "sextet" [4] and subsequent cases,[5] are immediately implicated. In *Younger* and its companions, the Supreme Court made clear that principles of comity and equity barred federal court interference with a state prosecution which was pending when the federal action was instituted unless certain exceptional circumstances, such as harassment or bad faith prosecution, were demonstrated. Younger v. Harris, *supra*; Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971). In Steffel v. Thompson, *supra*, however, the court drew a definitive line at the actual institution of criminal proceedings (i. e. arrest or indictment) rul-

---

3. It is not clear whether the quoted language represents a verbatim account of Major Moroney's testimony at the hearing. The statement is drawn from the testimony of Annette Olivo, the reporter at that hearing, and based on notes which consisted of summarizations of testimony interspersed with direct quotations. The exact date of the hearing on the Gemini Hotel's liquor license was not put into evidence, but Mr. DeLuca testified that the hearing was held within the two weeks preceding institution of this action. The Gemini Hotel's license was not revoked.

4. Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed. 2d 688 (1971); Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971); and Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971).

5. *See especially,* Steffel v. Thompson, *supra*; Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Lake Carriers' Assn. v. MacMullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972). *See generally,* Comment, Federal Declaratory Relief from Unconstitutional State Statutes: The Implications of *Steffel v. Thompson,* 9 Harv.Civ.Rts.Civ. Lib.L.Rev. 520 (1974); ("Implications of *Steffel*"); Note, Federal Relief Against Threatened State Prosecutions: The Implications of *Younger, Lake Carriers'* and *Roe,* 48 N.Y.U.L.Rev. 965 (1973).

ing that, at least insofar as actions for declaratory relief against threatened prosecutions, "considerations of equity, comity, and federalism have little vitality." *Steffel, supra,* 415 U.S. at 462, 94 S.Ct. at 1217. *See also* Lake Carriers' Ass'n v. MacMullan, *supra,* 406 U.S. at 509, 92 S.Ct. 1749, 32 L.Ed.2d 257. This Court need not determine here whether the Supreme Court's reasoning in *Steffel* should apply equally to actions for injunctive relief against threatened state prosecutions,[6] or whether a litigant seeking preprosecution injunctive relief must nonetheless make a showing of exceptional circumstances such as those set out in *Younger* and Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L. Ed.2d 22 (1965),[7] since I have found that plaintiffs have made a showing of a pattern of bad faith enforcement and harassment sufficient to warrant injunctive relief.[8] *See* Allee v. Medrano, *supra*; Dombrowski v. Pfister, *supra.*

The conclusion that principles of comity and federalism do not bar this action is but the first step in our analysis, for, in seeking to enjoin enforcement of § 12–7–1 on its face and as applied, plaintiffs request that a three-judge court be convened pursuant to 28 U.S.C. § 2281 et seq. This request necessitates the consideration of two additional issues. First, does the case of Lim v. Andrukiewicz, 360 F.Supp. 1077 (D.R.I.1973), mandate abstention? Second, is a three-judge court required to hear this action?

**6.** *See* Samuels v. Mackell, *supra. Cf.* Allee v. Medrano, 416 U.S. 802, 814, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974) ; Village of Belle Terre v. Boraas, 416 U.S. 1, 3, n. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974).

**7.** Comment, Implications of *Steffel, supra,* at 541, nn. 135, 136. *Cf.* Wulp v. Corcoran, *supra,* 454 F.2d at 835.

**8.** I note further that the principles of the *Younger-Steffel* line of cases may not apply here at all since the overriding concern of those decisions was to limit federal interference with threatened or pending state prosecutions. Here, no state criminal proceedings are pending, and plaintiffs do not seek to

## Abstention

First, in Lim v. Andrukiewicz, *supra,* plaintiffs' challenge to the constitutionality of § 12–7–1 was heard by a panel of three judges, of which I was a member and author of the unanimous opinion entered therein. After reviewing the decisions of the Rhode Island Supreme Court sustaining the constitutionality of § 12–7–1, the Court in *Lim* concluded that abstention was appropriate, since those decisions had not resolved the ambiguities present in the statute and the federal-state policy considerations favoring abstention outweighed plaintiffs' interests in gaining speedy resolution of constitutional issues in a federal forum. Since that time, the Rhode Island Supreme Court has not considered § 12–7–1, and the Court once again must determine whether this is a proper case for abstention. Clearly, the same ambiguities present when *Lim* was decided are present today, as are the important policy considerations of smooth federal-state relations which favor abstention. Nonetheless, I conclude that *Lim* does not require absention here on two separate grounds. First, I conclude that the injury to plaintiffs which will necessarily flow from a refusal to hear this action is so serious, urgent and dramatic as to tip the balance in favor of speedy resolution in the federal court.

"Abstention is a 'judge-made doctrine . . ., first fashioned in 1941 in Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, [61 S.Ct. 643,

interfere with any contemplated prosecution. Indeed, R.I.G.L. § 12–7–1 focuses exclusively on matters which will not necessarily result in the institution of criminal proceedings and I find that a continuation of the police practices challenged herein is unlikely to result in formal prosecution. *Cf.* Allee v. Medrano, *supra,* 416 U.S. at 817, n. 11, 94 S.Ct. 2191. But *see* opinion of Burger, C. J., in Allee v. Medrano, *supra,* 416 U.S. at 856–860, 94 S. Ct. 2191. Of course, even where the special considerations of *Younger* do not apply, plaintiffs must still demonstrate irreparable injury in order to warrant injunctive relief. *Id.* Such a showing has been made here.

85 L.Ed. 971] [that] sanctions . . . escape [from immediate decision] only in narrowly limited "special circumstances," Propper v. Clark, 337 U.S. 472, 492, [69 S.Ct. 1333, 1344, 93 L.Ed. 1480,]' Zwickler v. Koota, 389 U.S. 241, 248, [88 S.Ct. 391, 395, 19 L.Ed.2d 444] (1967), justifying 'the delay and expense to which application of the abstention doctrine inevitably gives rise.' England v. Medical Examiners, 375 U.S. 411, 418, [84 S.Ct. 461, 466, 11 L.Ed. 2d 440] (1964)." Lake Carriers' Assn. v. MacMullan, *supra*, 406 U.S. at 509, 92 S.Ct. at 1756–1757.

In *Lim* this Court considered some of the factors which would weigh against abstention:

"We note especially the caution that must be exercised in abstaining from an action where First Amendment rights are allegedly involved, see Zwickler v. Koota, *supra*; Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Baggett v. Bullitt, 377 U.S. 360, 378–379, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964), for the 'delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right [the plaintiff] seeks to protect.' Zwickler v. Koota, *supra*, 389 U.S. 252, 88 S.Ct. 397.

"However, the statute before us does not regulate First Amendment freedoms, nor does it have a direct impact on such freedoms. Rather this law is an exercise of the police power of the state in the balancing of the maintenance of law and order against the privacy and rights of its citizens. Admittedly, First Amendment overtones are raised in the factual situation presented to us. Plaintiffs have neither alleged nor proved a pattern of use of this statute to chill First Amendment rights or to abridge other constitutional rights. There has been no proof of a pattern of bad faith enforcement or harassment under this statute. Compare Dombrowski v.

Pfister, *supra*, 380 U.S. 490, 85 S.Ct. 1116. The demonstration took place over a year ago. No further incidents between the plaintiffs and the police were put into evidence.

"Given both the peripheral effect of this statute on First Amendment rights and the fact that the plaintiffs do not appear to be in danger of suffering any harm from the delay created by resort to the state court, we find that this is a proper case for abstention." *Lim, supra* at 1084 (footnote omitted).

As in *Lim*, the instant attack does not focus on First Amendment rights. But there the similarity ends. I find that plaintiffs herein have demonstrated a pattern of conduct which abridges their rights under the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment by exposing them to dragnet seizures and summary punishment. *See* Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). *Cf.* Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Plaintiffs have demonstrated a pattern of bad faith conduct, which the police claim to be authorized by § 12–7–1, to harass them by regular and repeated raids on the "Gemini"; a practice which the police intend to pursue in the future unless restrained. Thus, unlike the plaintiffs in *Lim*, the plaintiffs herein will suffer irreparable injury from a denial of injunctive relief and the delay created by relegation to the state courts. In considering the likelihood and length of that delay, this Court must take note of the fact that the status of Rhode Island decisional law remains the same today as on the date of the *Lim* opinion. *See* Dombrowski v. Pfister, *supra*. *See also,* Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1974). *Cf.* Lake Carriers' Assn. v. MacMullan, *supra*, 406 U.S. at 509, 92 S.Ct. 1749.

■■ Abstention is not appropriate here for a second, and perhaps more im-

portant, reason. I find no ambiguity in § 12–7–1 as to the conduct challenged herein, because I conclude that no interpretation of § 12–7–1 would support these police raids on the "Gemini." Abstention is not warranted here, for:

"[t]he doctrine . . . contemplates that deference to state court adjudication *only* be made where the issue of state law is uncertain. Davis v. Mann, 377 U.S. 678, 690, [84 S.Ct. 1441, 1447, 12 L.Ed.2d 609]; McNeese v. Board of Education, 373 U.S. 668, 673–674, [83 S.Ct. 1433, 1436–1437, 10 L.Ed.2d 622]; City of Chicago v. Atchison T. & S. F. R. Co., 357 U.S. 77, 84 [78 S.Ct. 1063, 1067, 2 L. Ed.2d 1174]." Harman v. Forssenius, 380 U.S. 528, 534, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965) (footnote omitted) (emphasis added). *Cf.* Lake Carriers' Assn. v. MacMullan, *supra,* 406 U.S. at 514, 92 S.Ct. 1749 (Powell, J., dissenting).

I find no such uncertainty herein. The defendants made no attempt to comply even with the letter of § 12–7–1, let alone employ it for the purposes for which it was enacted, i. e., investigation and questioning of those individuals whom a police officer has reason to suspect are committing, have committed or are about to commit a crime. *See* State v. Ramsdell, 109 R.I. 320, 285 A.2d 399 (1971); Ahern v. Lynch, 99 R.I. 316, 207 A.2d 296 (1965); Berberian v. Smith, 99 R.I. 198, 206 A.2d 537 (1965); Kavanagh v. Stenhouse, 93 R.I. 252, 174 A.2d 560 (1961), appeal dis'd, 368 U.S. 516, 82 S.Ct. 529, 7 L.Ed.2d 521. *Cf. Lim, supra.*

### Three-Judge Court

Second, plaintiffs seek to enjoin enforcement of § 12–7–1 as unconstitutional both on its face and as applied. There can be no question that a three-judge court must be convened pursuant to 28 U.S.C. § 2281 to rule on a challenge to the constitutionality of a state statute as it is applied. *See* Department of Employment v. United States, 385 U.S. 355, 87 S.Ct. 464, 17 L.

Ed.2d 414 (1966); Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1964); Query v. United States, 316 U. S. 486, 62 S.Ct. 1122, 86 L.Ed. 1616 (1942); Thomas v. Burke, 379 F.Supp. 231 (D.R.I.1974). *Cf.* Steffel v. Thompson, *supra,* 415 U.S. at 457 n. 7, 94 S.Ct. 1209. And where the state statute in question could be interpreted either to require or permit the challenged action, the challenge is to be viewed as implicating not merely the conduct of a public official, but rather the constitutionality of the statute as applied, thereby mandating a three-judge court. Thomas v. Burke, *supra.* However, in Query v. United States, *supra,* the Supreme Court concluded that a three-judge court would not be required where the cause of action was directed against the conduct of state officials "which state law could not reasonably be construed to authorize." *Id.,* 316 U.S. at 490, 62 S.Ct. at 1124. I have concluded that no interpretation of § 12–7–1 could support the police conduct challenged herein. Thus the instant action is limited in focus to the conduct of public officials in this particular case. There being no substantial attack on the constitutionality of § 12–7–1 on its face or as applied, a three-judge court need not be convened. I therefore express no views as to the constitutionality of § 12–7–1. Query v. United States, *supra*; Thomas v. Burke, *supra. See also* Phillips v. United States, 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800 (1941); Note, The Three-Judge District Court: Scope and Procedure Under Section 2281, 77 Harv.L.Rev. 299, 312–313 (1963). *Cf.* Allee v. Medrano, *supra,* 416 U.S. at 812, 94 S.Ct. 2191.

### Injunctive Relief

Having concluded that this matter is properly before a single judge, the Court must determine the propriety of granting plaintiffs' request for equitable relief. Although the matter originally came before the Court on plaintiffs' motion for a temporary restraining order, a hearing was held on December 6, 1974, at which defendants had the opportunity

to cross-examine plaintiffs' witnesses and to present their defense. In this posture, the Court has been able to make such findings of fact and conclusions of law as are necessary for consideration of the matter on the question of a preliminary injunction, and the Court will therefore turn directly to that issue. Fed.R.Civ.P. 52(a), 65. *Cf.* David v. Travisono, 495 F.2d 562 (1st Cir. 1974).

■ There can be no question that plaintiffs are entitled to injunctive relief. In the foregoing paragraphs, I have found that plaintiffs will suffer irreparable injury if an injunction does not issue. I have found that defendants' conduct is pursued in bad faith and constitutes an abuse of their authority under § 12–7–1. "Where, as here, there is a persistent pattern of police misconduct, injunctive relief is appropriate." Allee v. Medrano, *supra,* 416 U.S. at 815, 94 S. Ct. at 2200. *See* Dombrowski v. Pfister, *supra. Cf.* Younger v. Harris, *supra*; Cameron v. Johnson, 390 U.S. 611, 618–621, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968). Furthermore, I have concluded that this conduct abridges plaintiffs' constitutional rights under the Fourth and Fourteenth Amendments, so that the probability of plaintiffs' success on the merits is manifest. The injunction entered herein does no more than restrain the defendants from pursuing an unlawful and unconstitutional course of conduct. Thus, "the balance of hardships tips decidedly toward the plaintiff[s]," G.B.C., Inc. v. United States, 302 F. Supp. 1283, 1284 (E.D.Tenn.1969), and the criteria for the issuance of a preliminary injunction have been satisfied. *See* National Prisoners Reform Association v. Sharkey, 347 F.Supp. 1234 (D.R.I.1972); McClellan v. University Heights, Inc., 338 F.Supp. 374 (D.R.I. 1972); Palmigiano v. Travisono, 317 F. Supp. 776 (D.R.I.1970).

It is therefore ordered that defendants McQueeney, Moroney and their agents, subordinates and persons acting in cooperation with them are enjoined from:

1. Entering the business premises of the Gemini Hotel or stationing themselves in or directly in front of the entrance to the Gemini Hotel for the sole purpose of intimidating and threatening persons inside or intimidating and threatening persons wishing to enter the premises. This in no way restrains the police from entering for the performance of normal police business.

2. Questioning at the premises or otherwise taking into police custody any person present in the Gemini Hotel who has been previously questioned by the Providence police at the Gemini Hotel unless:

a) there exists probable cause for his or her arrest; or

b) in light of new information obtained subsequent to the previous questioning, there exists a need to conduct further interrogation with reference to said newly obtained information.

3. Removing any person from the Gemini Hotel and placing them in police custody pursuant to R.I.G.L. § 12–7–1 unless at the time of said seizure:

a) there is reason to suspect that the person so detained is committing, has committed or is about to commit a crime; and

b) the person to be detained has been questioned prior to removal as completely as possible under the circumstances; and

c) the removal and continued detention elsewhere are based on an actual need to conduct further investigation as to the possible criminal activities of the person so detained; and

d) the total length of such detention is for a period no greater than is necessary under the circumstances to conduct said further investigation, and in no event exceeds two hours unless arrested and charged with a crime.